UNIVERSITY COMMITTEE TO END the WAR IN VIET NAM, James M. Damon, John E. Morby and Zigmunt W. Smigaj, Jr.,

v.

Lester GUNN, Sheriff of Bell County, Texas; A. M. Turland, Justice of the Peace, Bell County, Texas, Precinct No. 4; John T. Cox, County Attorney, Bell County, Texas.

Civ. A. No. 67–63–W.

United States District Court
W. D. Texas,
Waco Division.

April 10, 1968.

On Motion for New Trial May 31, 1968.

Sam Houston Clinton, Jr., Austin, Tex., for plaintiffs.

Howard Fender, Asst. Atty. Gen. of Texas, Austin, Tex., for defendants.

Before THORNBERRY, Circuit Judge, SPEARS, Chief Judge and ROBERTS, District Judge.

PER CURIAM:

The University Committee to End the War in Viet Nam is an un-incorporated voluntary association composed of young men and women who are residents of Austin, Texas, and its environs. The purpose of the University Committee is to protest the conduct of the war in Viet Nam by means of discussions, publications, demonstrations, and non-violent direct action, in an attempt to bring the war in Viet Nam to a quick non-military end. The individual plaintiffs include both members of the University Committee and persons sympathetic to its purposes who participate in its affairs. The defendants are duly elected officials of Bell County, Texas.

During Monday, December 11, 1967, and the morning of Tuesday, December 12, 1967, various news media in the Central Texas area reported that The President of the United States was to appear and speak at a dedicatory program at Central Texas College. Central Texas College is situated near Killeen, Bell County, Texas. Killeen is a city of some 30,000 population and serves nearby Fort Hood, a large United States military establishment, reported to be the largest United States armored post. Fort Hood has a population of about 35,000 soldiers and an equal number of civilian dependents. From Fort Hood military members of armed units of the United States Army are transferred to Viet Nam and from Viet Nam many veterans of military service there are transferred to Fort Hood. The President of the United States was also scheduled to make an inspection of Fort Hood on December 12, 1967. Accompanying the President and his official party on the occasion of his appearance at Central Texas College was the usual corps of so-called White House press correspondents, and other representatives of the news media including television commentators and cameramen. Some 25,000 military personnel, their dependents, and civilians from in and around the central Texas area were assembled to hear the President of the United States and other speakers on the dedicatory program.

The evidence indicates that the members of the University Committee learned of the President's scheduled appearance on the morning of December 12, about three hours before the program was to begin. As many Committee members and interested parties as possible were notified, and several carloads of persons desiring to attend the President's speech drove to Killeen. The President had begun speaking when the group, which included the individual plaintiffs, arrived at the turnoff to the college. They parked the car some distance from the speaking area at the college. After choosing placards and signs, the group began walking in the direction of the college. The first people that the group met were friendly, waving and taking pictures of the group with their signs. They then came upon the main speaking grounds which were filled with soldiers in uniform and civilians.[1]

---

1. The signs used by the group were neither abusive nor obscene. Thereon were printed such slogans as "I have but One Idol—Hitler. 'General Ky';" "The War in Vietnam May be the Initial Phase of World War III. 'U Thant';" and "Wrong War, Wrong Time, Wrong Place. 'General Shoup'." However, members of the group knew that many of the servicemen were Viet Nam veterans; that the tremendous crowd at Fort Hood had peaceably assembled to hear their Commander-in-Chief; and that any untoward incident would likely cause the police, military and civilian, to react quickly to safeguard the President of the United States. As the group moved nearer to where the President was speaking, the epithets became angrier, and the general atmosphere of hostility was more pronounced. One member of the group stated that he had been dismayed at the sight of so many soldiers, but decided to proceed anyway. All of this, of

The group soon was surrounded by soldiers, some friendly, some hostile. Several of the group were attacked by soldiers, who snatched away the placards and physically struck several persons in the group. At that point, several military police seized members of the group and carried them out of the crowd. They were taken to sheriff's deputies. After being handcuffed and frisked, three were taken to the Killeen, Bell County Jail. Apparently there was some disagreement as to whether the incident had occurred on property lying in Coryell County or on property within Bell County. When the decision was reached that the incident was within the jurisdiction of the Bell County authorities, complaints were filed against the three men, charging the offense of disturbing the peace. Although the maximum punishment under the Texas "Disturbing the Peace" statute, Vernon's Ann.Tex.Pen.Code, Art. 474 (1952) is a fine of $200., the Bell County Justice of the Peace set bail for each of the men at $500.

This suit, seeking interlocutory and permanent injunctions and a declaratory judgment, was filed on December 21, 1967. Subsequently, on February 13, 1968, the criminal charges in Bell County were dismissed, on the County Attorney's motion; the reason recited for the dismissal was that the alleged offenses had occurred on a federal enclave, to which criminal jurisdiction had been ceded by the State of Texas.

## I

The dismissal of the criminal charges in Bell County caused the defendants in the present action to move this Court to dismiss this action for lack of jurisdiction. Defendants contend that the case is now moot for the reason that "no useful purpose could now be served by the granting of an injunction to prevent the prosecution of these suits because same no longer exists." It appears, in other words, that defendants' motion to dismiss is addressed to that part of the plaintiffs' complaint which seeks an injunction against the prosecution of the criminal charges in Bell County. We are clear that that part of plaintiffs' prayer is no longer before us. But we cannot fail to understand that, just as in Dombrowski v. Pfister, 380 U.S. 479, 483–492, 85 S.Ct. 1116, 14 L. Ed.2d 22 (1965) and Zwickler v. Koota, 389 U.S. 241, 253–254, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), more is involved where the prayer for relief also requests a declaratory judgment that the statute under which the criminal charges were brought is unconstitutional on its face for being overly broad. The dispositive question at this point then is whether the additional prayer defeats the defendants' argument that this Court is presently without jurisdiction to determine the merits of the case.

Any discussion of plaintiffs' standing in this regard must begin with a consideration of Dombrowski v. Pfister, supra. In that case the appellants brought suit for injunctive and declaratory relief to restrain the prosecution or threatening of prosecution under Louisiana's Subversive Activities law, which they alleged violated their rights of free expression. A three-judge court dismissed the complaint, holding that there was involved a proper case for abstention pending possible future narrowing of the state statute by state courts. The Supreme Court reversed, holding the abstention doctrine (i. e. waiting for a state court to clarify the state statute) inapplicable. The following language bears on our determination:

When the statutes also have an overbroad sweep, as is here alleged, the

---

course, lends credence to the argument that plaintiffs should have foreseen that a continuation of their protest, under the circumstances, would, in reasonable probability, provoke a disturbance, and possibly even end up in violence. See Feiner v. People of State of New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 267. But in our disposition of this case we do not reach and, therefore, do not decide this issue.

hazard of loss or substantial impairment of those precious rights may be critical. For in such cases, the statutes lend themselves too readily to denial of those rights. The assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases. * * * For '[t]he threat of sanctions may deter * * * almost as potently as the actual application of sanctions. * * *' Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. * * For example, we have consistently allowed attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity. * * * We have fashioned this exception to the usual rules governing standing * * * because of the '* * * danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.' (Emphasis added.)

380 U.S. at 486–487, 85 S.Ct. at 1120–1121. The Court then drew its conclusion, containing the now famous metaphor: "The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." 380 U.S. at 487, 85 S. Ct. at 1121. Indeed the Court went even further: "So long as the statute remains available to the State the threat of prosecutions of protected expression is a real and substantial one. Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression." 380 U.S. at 494, 85 S.Ct. at 1125.

The same kind of notion had been voiced earlier by the Fifth Circuit in Baldwin v. Morgan, 251 F.2d 780 (5th Cir. 1958). There a group of Negroes had brought a class action for injunction and declaratory relief against compulsory segregation in railroad waiting rooms. State charges had been filed against the Negroes but were dismissed because only the offending railroad or bus line could be criminally punished under the law. The Fifth Circuit held that the fact that criminal charges had been dismissed as against these particular plaintiffs did not bar the federal action:

> When the criminal proceeding was closed, it did not automatically take with it the charge made in this cause that state agencies, pretending to act for the state and exerting the power of their respective offices were, under the threat of arrest or other means, depriving Negroes of the right to be free of discrimination in railway public waiting rooms on account of race or color.

251 F.2d at 787.

More recently, in Carmichael v. Allen, 267 F.Supp. 985 (N.D.Ga.1967), a three-judge court had occasion to consider the mootness contention. Among other charges against the appellant was one charging him with violation of the Georgia statute on inciting insurrections. The state Solicitor General had disavowed any intention to prosecute under that statute for the acts already done. In the following language the three-judge court granted an injunction prohibiting future prosecutions under the insurrection law:

> Although the Solicitor General, defendant in this case, disavows any intention of presenting a proposed bill of indictment against any of these plaintiffs or any others for acts arising out of (the past events), or otherwise to seek prosecution for such acts under these insurrection statutes, neither Mr. Slaton nor any other representative of the state of Georgia has disavowed, any further intention to use these statutes in the future. It is hardly necessary to point out the 'chilling' effect upon the exercise of the freedom of speech and assembly of

a statute prescribing punishment by electrocution if a person, conscientiously seeking to exercise these rights, must pattern his speech with the ever present threat of such a sanction.

267 F.Supp. 994.

Is there then the requisite "chilling effect" here? The sworn evidence in support of the plaintiffs' prayer for relief indicates that these men have ceased efforts to carry out the purposes and objectives of the University Committee for fear of sanctions under the statute which is presently attacked, that they have "postponed further expression of (their) views through peaceful, non-violent activities lest (they) be arrested" for disturbing the peace. This in itself demonstrates a broad curtailment of activities which may include, and (as discussed in Part II) do include, protected behavior. Not only, as in *Carmichael*, supra at 994, can the presence of this statute cause a person to "pattern his speech with the ever present threat" of sanctions; here, it appears to have induced suspension of expression altogether.

With this background, how then do we evaluate the defendants' argument that inasmuch as the state charges have been dismissed, the record is bare, there is no "case or controversy", there is nothing useful which can be accomplished. Of course, it ignores the reality that plaintiffs' prayer includes the request for a declaration that the statute is unconstitutional on its face. It ignores the notion, introduced in *Dombrowski* and reiterated in *Carmichael*, that the statute's simple presence on the books (which is what the plaintiffs are attacking) may have the requisite "chilling effect" on constitutionally protected behavior to warrant close judicial scrutiny. It even ignores that at least twice in the area of First Amendment rights, the United States Supreme Court has felt compelled

to decide the constitutionality of state statutes where no state criminal charges thereunder were pending.[2] We therefore overrule Defendant's Motion to Dismiss, and proceed to a consideration of the merits.

## II

Before we discuss the issues presented as to the merits of this controversy, it may be wise to state what is not involved. This case does not involve in any way an appraisal of the constitutionality of the application of the statute to the plaintiffs; we do not evaluate whether Article 474 was constitutionally applied to these plaintiffs' activities. Our sole concern is the determination of whether Article 474 on its face is, as plaintiffs argue, constitutionally defective as being overly broad.

Article 474 provides:

Whoever shall go into or near any public place, or into or near any private house, and shall use loud and vociferous, or obscene, vulgar or indecent language or swear or curse, or yell or shriek or expose his or her person to another person of the age of sixteen (16) years or over, or rudely display any pistol or deadly weapon, in a manner calculated to disturb the person or persons present at such place or house, shall be punished by a fine not exceeding Two Hundred Dollars ($200).

Our inquiry deals with the overbreadth attack as it relates to the part of the statute which prohibits the use of "loud and vociferous * * * language * * * in a manner calculated to disturb the person or persons present." Does that part of the statute

offend[s] the constitutional principle that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep

---

**2.** *Dombrowski*, supra, and Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), as to the 1931 state loyalty oath. In addition, there was the determination of unconstitutionality after the disavowal of prosecution found in *Carmichael*.

unnecessarily broadly and thereby invade the area of protected freedoms.'

Zwickler v. Koota, 389 U.S. at 250, 88 S.Ct. at 396.

The United States Supreme Court some years ago in Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), outlined in broad terms the legitimate thrust of the breach of the peace offense:

> When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious.

310 U.S. at 308, 60 S.Ct. at 905. The Court vacated Cantwell's conviction because there had been no showing of violent or truculent conduct or assault or threatening of bodily harm.

In Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), the petitioner was convicted for violation of a disorderly conduct ordinance. The trial court had charged that "the 'misbehavior may constitute a breach of the peace if it stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance * * *'." The Court struck down the conviction, saying

> A function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute * * * is nevertheless protected against censorship or punishment, *unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconven-*

*ience, annoyance, or unrest.* (Emphasis added.)

337 U.S. at 4, 69 S.Ct. at 896.

The Supreme Court, in Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), had before it a state statute, which, like *Terminiello,* permitted conviction if the speech "stirred people to anger, invited public dispute, or brought about a condition of unrest." 372 U.S. at 238, 83 S.Ct. at 685. The evidence was that the petitioner had engaged in conduct which was boisterous, loud, and flamboyant. 372 U.S. at 233, 83 S.Ct. 680. The Court struck down the conviction, utilizing the *Terminiello* reasoning. An Atlanta city ordinance, prohibiting disorderly conduct, came under similar condemnation in Carmichael v. Allen, supra. The ordinance prohibited acting "in a boisterous manner." The three-judge court declared the ordinance unconstitutional as an unwarranted restriction of First Amendment Rights.

■ Texas Article 474 suffers the same constitutional infirmity. It cannot be doubted that the provision regarding the use of loud and vociferous language would, on its face, prohibit speech which would stir the public to anger, would invite dispute, would bring about a condition of unrest, or would create a disturbance. In so doing, the statute on its face makes a crime out of what is protected First Amendment activity. This is impermissible.

■ The Texas statute is subject to attack for still another reason. As pointed out earlier, Article 474 prohibits the use of "loud and vociferous language * * * *in a manner calculated to disturb*" the public. (Emphasis added.) Similar provisions have been subject to judicial scrutiny in Cantwell v. State of Connecticut, 310 U.S. at 308, 60 S.Ct. at 905; Ashton v. Kentucky, 384 U.S. 195, 200, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966); Carmichael v. Allen, 267 F.Supp. at 998–999; and Baker v. Bindner, 274 F.Supp. 658, 662–663 (W.D.Ky.1967).

Despite the defendants' contention that the language of Article 474 is significantly different from those examined in the above cases, it is our opinion that Article 474 must be added to the list of statutes which "leave to the executive and judicial branches too wide a discretion in the application of the law." It "leaves wide open the standard of responsibility," relying on "calculations as to the boiling point of a particular person or a particular group, not an appraisal of the nature of the comments per se." For this additional reason, Article 474 is vulnerable to constitutional attack.

The case which appears to present questions closest to our own is Thomas v. City of Danville, 207 Va. 656, 152 S. E.2d 265 (1967). There the petitioners were appealing on constitutional grounds a restraining order issued by the local corporation court. Among other things the order restrained the petitioners:

'4. From creating *unnecessarily loud,* objectionable, offensive and insulting noises, *which are designed to upset the peace and tranquility of the community;* and

\* \* \* \* \* \*

'6. From engaging in any act in a violent and tumultuous manner or holding unlawful assemblies *such as to unreasonably disturb or alarm the public.'* (Emphasis added.)

Because of the modifying language in the order, the scope of the restraint there was narrower than under the Texas statute. However, the Supreme Court of Appeals of Virginia had no difficulty in striking down the above parts of the order, doing so on *Terminiello* grounds.

We reach the conclusion that Article 474 is impermissibly and unconstitutionally broad. The Plaintiffs herein are entitled to their declaratory judgment to that effect, and to injunctive relief against the enforcement of Article 474 as now worded, insofar as it may affect rights guaranteed under the First Amendment. However, it is the Order of this Court that the mandate shall be stayed and this Court shall retain jurisdiction of the cause pending the next session, special or general, of the Texas legislature, at which time the State of Texas may, if it so desires, enact such disturbing-the-peace statute as will meet constitutional requirements.

### ADDENDUM ON MOTION FOR NEW TRIAL

Subsequent to this Court's Opinion of April 10, 1968, the Defendants have filed a motion for new trial and brief in support thereof. Hence, the Court files this addendum to the original opinion to dispose of points raised in Defendants' motion.

### I.

The contention is urged that the Bell County prosecutions were not brought under Article 474, Vernon's Ann. Texas Penal Code, and thus that the Court inappropriately determined the constitutionality of that statute. This argument is without merit.

It is clear that the initial complaints which were brought against the individual plaintiffs did not specify Article 474; the only language informing plaintiffs of the nature of the charge against them was the typewritten phrase "Dist. the peace." However, that the complaints themselves do not expressly refer to Article 474 is of no moment. In the Agreed Statement of Facts and Stipulations, filed with the official papers in this cause, Plaintiffs and Defendants agreed that individual plaintiffs "were each charged with disturbing the peace in violation of Article 474." It was on the question of the constitutionality of Article 474 that issue was joined in the cause. An examination of the various Texas statutes which proscribe offenses against the public peace discloses that the only one encaptioned "disturbing the peace" is Article 474. And it is instructive to note that the complaints were ultimately dismissed on jurisdictional grounds, not for failure to adequately apprise these plaintiffs of the offense charged, i. e. Article 474. In short, there

simply can be no doubt that these plaintiffs were charged with violating Article 474 of the Texas Penal Code.

The applicability of Article 474 is important because these arrests indicate that the State considers Article 474 an appropriate vehicle for the regulation or prohibition of demonstrations. Our original decision was that as presently written, Article 474 was not an appropriate vehicle for controlling demonstrations. The decision in no way implied that Texas lacks the power to regulate demonstrations, but implements the well-settled principle that "the power to regulate must be so exercised as not, in attaining a permissible end, to unduly infringe a protected freedom." Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L. Ed.2d 231 (1960). Our opinion indicated that this principle was disregarded in the Texas statute because its broad scope violated the dictates of the First Amendment. Zwickler v. Koota, 389 U.S. 241, 246, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

## II.

In Defendants' Motion for New Trial and the accompanying briefs, they strive to indicate that Texas courts have adopted a construction which substantially narrows Article 474's language. Defendants argument on this point is based on the view that the critical and dispositive phrase in Article 474 is the use of "loud and vociferous language." That view compels them to the conclusion that the statute invokes a prohibition only as to the quantum of noise or sound. The Defendants phrased their conclusion thusly:

> This interpretation by the Court of Criminal Appeals eliminates entirely under this Section of the Statute any offense based on the context of the words used and does not attempt to restrict the thoughts to be conveyed in violation of the First Amendment.

To support that conclusion, the Defendants direct our attention to three Texas cases in which the Texas Court of Criminal Appeals has defined the phrase "loud and vociferous language." In Anderson v. State, 20 S.W. 358 (Tex. Cr.App.1892), the appellate court adopted Webster's definition of "vociferous" as "[m]aking a loud outcry; clamorous; noisy; * * * with great noise in calling; shouting." See also West v. State, 131 Tex.Cr.R. 191, 97 S.W.2d 476 (1936). In Thomason v. State, 98 Tex.Cr.R. 312, 265 S.W. 579 (1924), the Court of Criminal Appeals defined "loud" as "marked by intensity, or relative intensity; not low, soft, or subdued." See also West v. State, supra. In all three cases, the convictions were reversed because the language used did not rise to the level of "loud and vociferous."

In holding that these definitions do not save the statute, we have considered the nature of the demonstrations that pervade our society today. The nature of these protest movements has convinced us that while the Texas definitions may suffice for non-first amendment situations, they are inappropriate in the free-speech arena. The modern demonstration involves hundreds or thousands of citizens marching along highways, picketing public accomodations or schools, or conducting mass meetings in parks or other public buildings. Although these protests create problems, the decisions clearly hold that the peaceful expression of views by demonstrations, marches, and assemblies are within the ambit of the First Amendment. See Strother v. Thompson, 372 F.2d 654 (5th Cir. 1967); Guyot v. Pierce, 372 F.2d 658 (5th Cir. 1967); Hamer v. Musselwhite, 376 F.2d 479 (5th Cir. 1967); N. A. A. C. P. v. Thompson, 357 F.2d 831 (5th Cir. 1966); Wooten v. Ohler, 303 F.2d 759 (5th Cir. 1962). Indeed, it has been held that the individual must be afforded some appropriate "public forum" for his peaceful protests. See Guyot v. Pierce, supra, at 661; Kalvan, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct.Rev. 1.

Two Supreme Court cases confirm that Texas' definition of "loud and vociferous" aborts the right to express views by assemblies or demonstrations. In Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697

(1963), the protesters were arrested for "boisterous, loud, and flamboyant conduct" that created a breach of the peace. This conduct consisted of "loudly singing '[t]he Star Spangled Banner' and * * * stamping their feet and clapping their hands." The Court held that the arrests violated their right to free speech and assembly. In Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), a large group marched to the courthouse where they listened to speeches, sang and prayed. The officials testified that the crowd got unruly after Cox in an "inflammatory manner" urged everyone to go downtown and sit in at the lunch counters. The "loud cheering and clapping by the students" was another reason for their arrests. This conduct was described as "a jumbled roar like people cheering at a football game"; "loud cheering and spontaneous clapping and screaming and a great hullabaloo"; "a shout, a roar,"; "and an emotional response 'in jubilation and exhortation.'" 379 U.S. at 546, 85 S.Ct. at 460. In holding that such conduct did not constitute a breach of the peace, the Court noted that the testimony indicated that while the demonstration was loud, it was not disorderly. Because we are certain that the conduct in *Cox* and *Edwards* would be "loud and vociferous" within the Texas definitions, we hold that Texas has an overbroad definition of the offense when applied to activities

fairly within first-amendment protection. Moreover, its scope could be used not only against demonstrations, but to curtail the street-corner orator that the authorities thought was too loud. The right to communicate ideas through speech and protests must carry with it the opportunity to win the attention of the public. The state may regulate that right only when substantial state interest necessitates protection. This statute, however, would allow suppression without requiring that any substantial disturbance was imminent; or that the noise of the demonstration stifled the operations of the building picketed; or drowned out other speakers, Turner v. Goolsby, 255 F.Supp. 724 (S.D. Ga.1966); or created a traffic or pedestrian movement problem.[1]

Therefore, the quantum of disruption necessary for the violation of Article 474 constitutes an "unwarranted abridgement of the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." See Guyot v. Pierce, supra, 372 F.2d at 661. Indeed, any demonstration considered by this court could be suppressed for its "loud and vociferous" manner under the Texas statute.[2] It is these considerations, as well as the factors enumerated in our prior opinion that convince us that the breadth of Artice 474 goes far

---

1. This statute does not therefore carve out of a demonstration that conduct which does not have First Amendment protection. For examples of conduct that does not have this protection, see N. A. A. C. P. v. Thompson, 357 F.2d 831 (5th Cir. 1966) (cannot obstruct traffic or block sidewalks); Baines v. City of Danville, 337 F.2d 579 (4th Cir. 1964) (could protest fact of segregated theaters but could not exclude others from use or have massive occupancy of the approaches); Pritchard v. Downie, 326 F.2d 323 (8th Cir. 1964) (cannot have riotous conduct); United States v. Aarons, 310 F.2d 341 (2d Cir. 1962) (cannot block launching of vessel); Hurwitt v. City of Oakland, 247 F.Supp. 995 (N.D.Cal.1965) (a group of demonstra-

tors could not insist upon the right to cardon off a street or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations).

2. Strother v. Thompson, supra; Guyot v. Pierce, supra; Hamer v. Musselwhite, supra; N. A. A. C. P. v. Thompson, supra; Pritchard v. Downie, supra; Baines v. City of Danville, supra; Cottonreader v. Johnson, 252 F.Supp. 492 (M.D.Ala.1966); Hurwitt v. City of Oakland, supra; Williams v. Wallace, 240 F.Supp. 100 (M.D.Ala.1965); United States v. Clark, 249 F.Supp. 720 (S.D. Ala.1965); King v. City of Clarksdale, 186 So.2d 228 (Sup.Ct.Miss.1966).

beyond what is necessary to achieve a legitimate governmental purpose.

That does not, however, conclude our criticism, in terms of overbreadth, of the Texas statute; the definition of "loud and vociferous" does not end the interpretative problems created by Article 474. Not only do the Texas decisions convince us that Texas courts take seriously the requirement that the language be loud and vociferous, but they also, contrary to the Defendants' suggestion, indicate that Texas courts take seriously that part of Article 474 that prohibits the use of loud and vociferous language "in a manner calculated to disturb the person or persons present." In other words, to sustain a conviction, not only must the first element be present but there is the further requirement that the action be done in a manner calculated to disturb. A simple reading of the statute and a review of the cases make this second requirement apparent.

Article 474 prohibits "swearing and cursing * * * in a manner calculated to disturb * * *" Is simply swearing and cursing sufficient for a conviction? Not according to Young v. State, 44 S.W. 507, 508 (Tex.1898), where the Court of Criminal Appeals approved the following language:

> That the mere cursing or swearing or other language uttered is not the gist of the offense, but such cursing or swearing or use of other language must be in a manner reasonably calculated to disturb the people or a part of the people assembled at the public place * * *

Article 474 prohibits "rudely display-[ing] any pistol * * * in a manner calculated to disturb * * *." In Bell v. State, 158 Tex.Cr.R. 393, 256 S.W.2d 108, 109 (Tex.1953), the court stated:

> There is no offense known as "rudely displaying a pistol," but such may constitute a violation of the disturbing-the-peace statute, art. 474, Vernon's Ann.P.C., *when done in a manner calculated to disturb the peace.* (Emphasis added.)

And in West v. State, supra, 97 S.W.2d at 473, a loud-and-vociferous language case cited by the Defendants, the Court of Criminal Appeals in its original opinion made it clear that more must be submitted to the jury than simply the question of loud and vociferous language:

> Whether or not appellant's conduct and the language used by him was such as was calculated to disturb the inhabitats at the time and place charged was a question for the jury to determine.

Indeed, the State's own argument concedes that the phrase "calculated to disturb the person or persons present * * *" has not been read out of the statute. The state has said that loud and vociferous language refers "to a course of conduct which creates so great an amount of noise that it was calculated to disturb the peace and tranquility of the occupants of a private residence or person in a public place." This contention undermines the State's original suggestion and reveals that the key to understanding the Texas statute is not the meaning of loud and vociferous, but the effect, in terms of quantum of disturbance, that the speech had on others. An examination of the Texas decisions shows that this quantum of disturbance is the same as that condemned in Edwards and Cox. E. g., Woods v. State, 213 S.W.2d 685, 687 (Tex.Cr.App.1948), and Head v. State, 131 Tex.Cr.R. 96, 96 S.W.2d 981, 982–983 (1936). These decisions prompted our original holding that the peaceful, orderly expression of views by marches or demonstrations cannot be interfered with, merely because the views expressed may be so unpopular at the time as to stir the public to anger, invite dispute, or create the chance of unrest. See Hurwitt v. City of Oakland, 247 F.Supp. 995 (N.D.Cal.1965). See also Brown v. State of Louisiana, 383 U.S. 131, 147, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); Cox v. State of Louisiana, supra, at 552, 85 S. Ct. 453. Thus the quantum of disturbance necessary for violation sweeps within its broad scope conduct protected by the First Amendment.

We emphasize again that our holding does not mean that Texas lacks the power to regulate demonstrations. These regulations on the time, place, and manner must be reasonable and implemented by a narrowly drawn statute.[3] Article 474 is not a reasonable regulation for deciding when the protest movements impinge on the peace and order of the community because it unduly circumscribes protected conduct under the guise of preserving public order.

For these reasons, the defendants' motion for new trial is overruled and it so ordered.

---

3. See N. A. A. C. P. v. Thompson, supra; Baines v. City of Danville, supra; Pritchard v. Downie, supra; Turner v. Goolsby, supra; Cottonreader v. Johnson, supra; United States v. Clark, supra.