STATE of Delaware

v.

Ramon M. CECI, David A. McCorquodale,
Steven Sass and George Wol-
kind, Defendants.

Superior Court of Delaware.

New Castle.

May 29, 1969.

OPINION

O'HORA, Justice.

Defendants herein appeal their conviction, in the City of Newark Alderman's Court, of disturbing the peace by distributing at the University of Delaware leaflets containing vulgar, obscene or abusive language. Pursuant to a stipulation with the State, defendants have filed a motion to dismiss the information alleging therefor two independent grounds:

1. Application of the ordinance under which defendants were convicted violates their right to freedom of speech and press as guaranteed by the First Amendment to the Constitution of the United States and by Article I, Section 5 of the Constitution of the State of Delaware of 1897, Del.C. Ann.

2. Application of the ordinance to the conduct of defendants violates the due process clause of the Fourteenth Amendment of the Constitution of the United States because the ordinance is vague and fails to provide a reasonably definite standard by which either they or a Court might judge their conduct.

By stipulation, the relevant facts are those adduced at the trial below. The following appears from the transcript: On the morning of April 22, 1968, each of the defendants distributed leaflets on the University of Delaware campus. Hand printed in large letters across the top of each leaflet was the quotation "Up Against The Wall M.....F....."[1] The last word occupied a separate line and was underlined. Beneath the quotation were several paragraphs which developed the theme that true obscenity was to be found, not in words, but rather in the conduct of the Vietnam war by the United States, and in this country's tolerance of black ghettoes. The leaflet concluded with an invitation to a "teach-in" planned for that evening.

Jerome O. Herlihy, Deputy Atty. Gen., Wilmington, for the State.

Alfred J. Lindh, Wilmington, Franklin S. Eyster, II, Richards, Layton & Finger, Wilmington, for defendants.

1. This last word was spelled out in the leaflet but the Court here sees no legitimate purpose to be served by repeating it in full.

Defendants distributed the leaflets without regard to sex or age of the recipient, handing them to passersby on walkways or in corridors and placing them on coffee or lunch tables at which students were seated. Although no one was physically forced by defendants to accept and read a leaflet, when one of the defendants held a leaflet out to one of a group of female students eating lunch in the dining hall, and she "didn't take it, * * * he put it on the table * * *" anyway. At another table, where a male student and his female acquaintance were seated, one of the defendants "unsolicited, sticks that [a leaflet] in her face and my face", and was ordered to "Get the hell out of here". One male student who was handed a leaflet "went into a sort of rage" upon reading the headline and to demonstrate his disgust knocked the leaflets from one of the defendant's hands.

Complaints regarding the obscene nature of the leaflets led to defendants' arrest sometime during the early afternoon. They were subsequently convicted under Newark's disorderly conduct statute, Section 205 of the Code of Ordinances [2], which provides *inter alia* that no one shall disturb the peace by using any vulgar, obscene or abusive language in any public place.

Quite apart from any constitutional objections, defendants at the outset challenge their conviction on the grounds that conviction under the ordinance requires a showing of two elements, namely, use of the proscribed language and a resultant breach of the peace.

No breach of the peace, it is said, has been shown; hence the conviction must be set aside. The answer to this argument is twofold. First, it is well within the legislative power to proscribe the public use of indecent or obscene language without any further requirement that such use cause a breach of the peace. Williams v. District of Columbia, 227 A.2d 60 (D.C. App.1967).

Consequently, the admonition that "No person shall disturb the peace by: * * * (c) using any vulgar, obscene or abusive language in any public place" may reasonably be viewed as a partial codification of the common law crime of breach of the peace which merely spells out conduct constituting the offense. Under this view, engaging in any such conduct is in itself deemed a breach of the peace; no separate or additional breach must be shown. The ordinance so interpreted is narrowly drafted and would serve as a meaningful deterrent to activities tending to disturb the public order.

Under the defendants' view, however, the ordinance verges on being an exercise in futility. For example, it would make "inciting any other person to commit any breach of the peace" a crime only when a breach of the peace actually resulted. By punishing only the accomplished disorder, rather than directly prohibiting the identified causes of probable disorder, the ordinance would be ill-suited to safeguard the public peace. The Court cannot believe that the draftsmen who took such care to enumerate precisely various forms

2. 205. Disorderly conduct
   (1) No person shall disturb the peace by:
   (a) being intoxicated in a public place.
   (b) participating or abetting in any rude, indecent, riotous, drunken or violent conduct.
   (c) using any vulgar obscene or abusive language in any public place.
   (d) committing any obscene, indecent or immoral act in any public place.
   (e) inciting any other person to commit any breach of the peace.
   (f) drinking intoxicating liquor in a public place other than premises licensed to sell intoxicating liquor for consumption on the premises.
   (2) No person shall knowingly permit any disorderly conduct on any premises owned or controlled by him.
   Any person violating any of the provisions of this Ordinance shall, upon conviction, be punished by a fine of not more than $200 or imprisonment of a period of more than 90 days, or both.

of undesirable conduct intended the net effect of their effort to be the vague and ineffectual legislation which defendants see in Section 205. This construction must be rejected.

■ Secondly, a breach of peace and good order (in the usual sense) does appear from the record. The obscene language in the headline of the leaflet (as opposed to the political ideas in its body) caused an argument in which a student knocked the leaflets from the hands of one of the defendants—a technical assault— and in another instance precipitated a heated warning to one of the defendants to "Get the hell out of here". The degree of friction which must be tolerated to protect and encourage the free flow of ideas may quite properly be punished when occasioned by the public use of obscene and vulgar language. Accordingly, defendants' conviction under the ordinance need not be set aside for failure of proof.

■ Defendants also claim, however, that the ordinance prohibits only the spoken use of obscene or vulgar language. They draw this conclusion from the existence of a separate ordinance, Section 503,[3] which pertains expressly to obscene and indecent writings. Since criminal statutes must be construed as narrowly as reasonable, they argue that their conviction could be upheld, if at all, only under Section 503. No great study of Section 205 is required to conclude that it is intended to banish from public places drunken and coarse behavior. Drunkenness does not here concern us. Coarseness is the subject of several subsections of the ordinance, which variously proscribe "rude, indecent, riotous, * * * or violent conduct", "vulgar, obscene or abusive language * * *", and "any obscene, indecent or immoral act * * *". People may entertain coarse thoughts in public but under this ordinance they are not to translate such thoughts into actions, nor give expression to such thoughts by gesture or language, at least while in a public place. Considering the comprehensive purpose and scope of Section 205, the subsections of which overlap one another in an effort fully to cover the

3. 503. Producing, selling or distributing obscene writings, drawings, photographs, etc.

Whoever sells, lends, distributes, exhibits, gives away or shows, or offers to sell, lend, distribute, exhibit, give away or show, or has in his possession with intent to sell, lend, distribute, exhibit, give away or show, or knowingly advertises in any manner whatsoever, any osbcene, lewd, lascivious, filthy indecent book, magazine, pamphlet, newspaper, store-paper, paper, writing, drawing, photograph, film, figure or image, or any written or printed matter of an indecent, obscene, lewd, lascivious, filthy nature, or any particle or instrument of indecent or immoral use or purpose, or purporting to be for indecent or immoral use; or

Whoever designs, copies, draws, photographs, prints, shows, utters, publishes or in any manner manufactures, produces or prepares an obscene, lewd, lascivious, filthy or indecent book, magazine, pamphlet, newspaper, story-paper, paper, writing, drawing, photograph, film, figure or image, or any article or instrument of indecent or immoral use of purpose, or purporting to be for indecent or immoral use; or

Whoever writes, prints, publishes or utters or causes to be printed, published or uttered, any advertisement or notice of any kind giving information, directly or indirectly, stating or purporting to do so, where, how, of whom, or by what means any, or what purports to be any, obscene, lewd, lascivious, filthy or indecent book, magazine, pamphlet, newspaper, store-paper, paper, written or printed matter of an indecent, obscene, lewd, lascivious or filthy nature, or any article or instrument of indecent or immoral use or purpose, or purporting to be for indecent or immoral use, can be purchased, obtained or had—

Shall be fined not less than $250 nor more than $2,500, or imprisoned for not less than 30 days nor more than 3 years, or both. For each subsequent conviction, the court shall impose a fine of not less than $500 nor more than $5000, or imprisonment for not less than 6 months nor more than 5 years, or both.

Nothing in this subchapter shall be construed as interfering with the rights, privileges, and duties of the medical profession in advising, publishing or illustrating the use of methods and instruments for any of their patients.

subject, the Court cannot reasonably construe the ordinance as intended to prohibit only the vocal use of obscene and vulgar language.

■ An examination of Section 503 sheds further light on this problem. This section deals with obscene literature and printed matter of an obscene nature regardless of where distributed. Had defendants been convicted under this statute, they might well have argued that the leaflet, considered in its entirety as a writing, which is what the ordinance requires, is not obscene despite the presence of certain obscene language—a point which the State readily concedes. The overriding purpose of Section 503 is to prevent the commercial exploitation of obscenity, whereas the purpose of Section 205 is to protect the sensibilities of the public from such affronts as are inconsonant with public peace and order. If any governmental interest has been jeopardized by defendants' actions, it is clearly the latter. Thus this argument must also be regarded as devoid of merit.

■ Closely related to the foregoing is defendants' contention that their conviction under Section 205 violates due process because the ordinance fails to warn that conduct such as theirs is an offense. Under defendants' view, conviction would be proper had they spoken obscene words to passersby; but had they written the same words in large print on signs and paraded the signs about, they must go unpunished notwithstanding that the effect upon the public is exactly the same. Merely stating such a view is its own most effective refutation. No reasonable citizen reading the ordinance could mistake its purpose; no reasonable citizen could suppose that "using any vulgar, obscene or abusive language in any public place" should be construed in such a way as to make thwarting that purpose such an easy matter. Defendants' suggestion to the contrary cannot be seriously entertained.

With respect to defendants' freedom of speech and press argument, the positions taken by the parties differ not so much on the law as on the necessity of taking the offensive language in context with the remainder of the leaflet. Defendants insist that it must be taken in context. If this is true, then the State concedes that freedom of speech and press protect the defendants from sanction. However, the State insists that the offensive language may be considered in and of itself, thus bringing the sanctions of the ordinance into play.

■ Assuming without deciding that the right to communicate ideas through speech and the press must carry with it the opportunity to win the attention of the public, nevertheless, the State has the right to regulate the process of winning attention when a substantial State interest necessitates protection. See University Committee to End War in Viet Nam v. Gunn, 289 F.Supp. 469 (D.C.Tex.1968). There is no room to doubt that the quotation, "Up Against The Wall M..... F....." printed in large letters at the top of the leaflet is a headline intended to capture the reader's attention. The State does not contest the defendants' right to use the word "m..... f....." in the body of their essay, a right which they in fact exercised. The question therefore becomes, does the use of obscene language to attract attention to a constitutionally protected message offend a substantial State interest?

Certainly the defendants could not, under the guise of free speech, enter a theater and yell "fire" in order to bring everyone into the streets where they intended to deliver a speech or distribute leaflets expounding on the theme that people will act drastically to save their own immediate lives, but will do nothing to help eliminate the rat-infested firetraps in which millions of impoverished Americans live. Nor could they, under the guise of free speech, commit lewd, obscene or immoral acts in a public place as a prelude to the showing of a documentary film intended to demonstrate the "true" obscenity of the war in Vietnam. These examples, though more drastic, are in principle the same sort of

attention-getting device as defendants have employed in their leaflet. The fact that the forbidden language appears on the same sheet of paper as does an essay incorporating and explaining the use of that obscenity brings defendants' conduct to the very dividing line between the permissible and the impermissible, but such a line exists and must be respected. Recipients of defendants' leaflets did not have prior knowledge of the contents of the essay such as would provide a "context" in which the objectionable headline could be "taken" when they first read it, precisely because a headline is meant to be read first. Defendants probably counted on this very fact to give the headline a certain shock value. But it is well recognized that States and municipalities have a legitimate interest in protecting their citizens from uninvited shocks of this kind. Even assuming that further reading of the leaflet would soothe the reader's initial outrage, by revealing the "obscenity" of the headline as merely an illusion, nevertheless, citizens confronted without their consent [4], and affronted, by an obscene headline cannot be required to read on at the risk of further offense.

■ In short, having by size of print, placement and underlining of an obscene word taken it out of context so as to maximize its attention-getting potential, defendants will not be heard now to argue that the word must be afforded the same protection it has when taken in context of the body of the essay.

■ The City of Newark has the power to grant its citizens a right not to be confronted with obscene and vulgar language in public places. As stated in Chicago Park District v. Lyons, 39 Ill.2d 584, 237 N.E.2d 519 (1968):

"* * * The rights of an individual to freely speak, write and distribute his writings are among the most important values in our society, and have been zealously guarded * * *. But they are not absolute, and when alternative methods of distributing literature are available, each of which affords the individual substantially equal opportunities for communication with others, we believe municipal corporations may constitutionally restrict the distributor to the method not violative of the rights of others. * * *"

This concept underlies the Supreme Court's approval of municipal legislation preventing people from imposing their opinions on others by use of sound trucks; and it is at the heart of Justice Stewart's concurring opinion in Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L. Ed.2d 195 (1968) wherein he stated that the Constitution protects not only a person's freedom of speech, but also his freedom of choice in deciding what he will read or to what he will listen. Section 205, far from violating any constitutional right, merely insures Newark citizens the freedom to choose whether or not they will read or listen to obscene language. All ways of attracting their attention, consistent with this right, remain open to defendants under Section 205 and to all others who wish to communicate with the public. The ordinance is, therefore, constitutional.

■ The final contention made by the defendants is that the phrase, "Up Against The Wall M.....F.....", is neither abusive nor obscene nor constitutionally punishable merely for being vulgar. Admittedly the phrase, if not directed to any-

---

4. Reading a headline or a leaflet handed to or placed before one, so as to determine whether to keep or discard it, is as automatic and non-consensual as looking up to find an immoral act being committed in the street. One indeed chooses to read the headline, but since its contents are unknown until read, one has not chosen thereby to read an obscenity, any more than one chooses when looking down a street to see unexpectedly the commission of an immoral act.

one in particular, is not abusive. But the word, "m.....f....." is clearly obscene and vulgar. As such, it is not entitled to any constitutional protection. This principle is well stated in Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) where it was said:

"Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. * * *"

The defendants urge that the Court apply the definition of obscenity found in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). This can be done only at the expense of ignoring the important distinction between obscene language or speech, and obscene writings, which the quoted material from *Chaplinsky* impliedly recognizes, and which was this Court's basis for differentiating between Section 205 and Section 503. A writing may be obscene without using a single obscene word, because the matter set forth in such writing may appeal to a prurient interest in sex. On the other hand, a word may not in and of itself appeal to a prurient interest in sex, yet express a concept so depraved, immoral and shocking to the common sense of decency as to be "obscene".[5] Public utterance of such a word or words has long been considered a crime in numerous states. See cases collected at 48 A.L.R. 83. Obscene words do not need protection in order "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people". Roth v. United States, *supra*. Accordingly, defendants are beyond the pale of the First and Fourteenth Amendments.

For the reasons herein set forth the Court concludes that defendants' motion to dismiss should be denied.

It is so ordered.

---

5. Webster's Third New International Dictionary (Unabridged, 1961) defines "obscene" in pertinent part as follows:
"* * *. 1.a: disgusting to the senses usu. because of some filthy, grotesque or material quality * * * b: grossly repugnant to the generally accepted notions of what is appropriate * * *

2. offensive or revolting as countering or violating some ideal or principle as a: abhorrent to morality or virtue * * * b: marked by violation of accepted language inhibitions and by the use of words regarded as taboo in polite usage. * * *"