Francisco **MEDRANO** et al., Plaintiffs,

v.

**A. Y. ALLEE** et al., **Defendants.**

**Civ. A. No. 67 B 36.**

United States District Court,
S. D. Texas,
Brownsville Division.

June 26, 1972.

Dixie, Wolf & Hall, Chris Dixie, Robert E. Hall, and George C. Dixie, Houston, Tex., for plaintiffs.

Crawford C. Martin, Atty. Gen., Hawthorne Phillips, Allo B. Crow and Gilbert Pena, Asst. Attys. Gen., and Atlas, Schwarz, Gurwitz & Bland, Gary R. Gurwitz, McAllen, Tex., Luther E. Jones, Jr., Corpus Christi, Tex., Frank R. Nye, Jr., Rio Grande City, Tex., for defendants.

Before JOHN R. BROWN, Chief Judge, and GARZA and SEALS, District Judges.

## OPINION OF THE COURT

SEALS, District Judge:

From June, 1966, until June, 1967, the United Farm Workers Organizing Committee, AFL–CIO, was engaged in an effort to encourage the predominantely Mexican-American farm laborers of the lower Rio Grande Valley of Texas to join with the union in obtaining greater eco-

nomic benefits for this class. The individual plaintiffs herein were at various times associated or in sympathy with this movment. In pursuit of their objectives, strikes were called; and picket lines, rallies and demonstrations were employed to enlist nonunion laborers in the common cause. These activities, and the responses triggered thereby, resulted in a controversy characterized on both sides by strong emotions and sometimes violent reactions. During this period supporters of the strike came into open conflict first with local and later state authorities, which led to numerous arrests and the initiation of prosecutions under various state laws. Finally, all picketing in support of the strike was enjoined by a state district court.

## I. STATEMENT OF THE CASE

■ Plaintiffs have brought this suit against certain Texas Rangers, officers of the State of Texas, and other public officials of Starr County, Texas, seeking declaratory and injunctive relief. The suit was filed as a class action by plaintiffs on behalf of those similarly situated; it is properly maintainable as such pursuant to Rule 23(a) & (b) (2) of the Federal Rules of Civil Procedure.

It is asserted that jurisdiction of the court over this complaint arises under Sections 1343, 2201, 2202, 2281 and 2284 of Title 28, United States Code, Sections 1983 and 1985 of Title 42, United States Code; and the First and Fourteenth Amendments to the Constitution of the United States. The complaint seeks declaratory and injunctive relief in an attack on the constitutionality of certain state statutes, and an injunction is sought restraining defendants from enforcing these statutes against plaintiffs and their class. The complaint also alleges that defendants, as state officials acting under color of state law, conspired and did deprive plaintiffs of their civil rights, privileges and immunities protected by the laws and Constitution of the United States.

The disputed issues of fact and law were presented to the court, arguments of counsel have been heard and their briefs considered. The following constitutes the Findings of Fact and Conclusions of Law of this Court.

■■ The first matter to be determined is the effect of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its companion cases [1] upon this litigation. *Younger* is not an abdication of the federal role in protecting citizens from "official lawlessness." It is a simple restatement of what has always been the law, namely, that a state criminal prosecution begun in good faith will not be enjoined, even on constitutional grounds by a federal court, except under extraordinary circumstances where the danger of irreparable injury is both great and immediate. Fenner v. Boykin, 271 U.S. 240, 243–244, 46 S.Ct. 492, 70 L.Ed. 927 (1926); Douglas v. City of Jeannette, 319 U.S. 157, 163–164, 63 S. Ct. 877, 87 L.Ed. 1324 (1943).[2] In *Younger* the Supreme Court followed this long standing doctrine and held that a good faith prosecution under a possibly unconstitutional statute should not be enjoined absent special circumstanc-

---

1. Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971).

2. *See,* Academy, Inc. v. Vance, 320 F. Supp. 1357 (S.D.Tex.1970) for a pre-Younger example of a dismissal for failure to show a bad faith prosecution. *See,* Duncan v. Perez, 321 F.Supp. 181 (E.D. La.1970), aff'd 445 F.2d 557 (5th Cir. 1971), cert. den. 404 U.S. 940, 92 S.Ct. 282, 30 L.Ed.2d 254 (1971) for a pre-Younger use of *Younger* principles in an action to enjoin re-prosecution where the evidence established that the re-prosecution was in bad faith for purposes of harassment and would deter and suppress the exercise of federally protected rights by Negroes in Plaquimines Parish.

es.[3] This result was predicated on two grounds: comity (the respect for the judicial processes of the States) and equity (the existence of an adequate remedy at law). 401 U.S. 37 at 43–44, 91 S.Ct. 746, 27 L.Ed.2d 669. It is also clear from *Younger* that Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) is still the law, and that bad faith prosecution is the type of immediate and irreparable harm which justifies federal intervention to protect federally secured rights. 401 U.S. 37 at 48–49, 91 S.Ct. 746, 27 L.Ed.2d 669. See, The Supreme Court, 1970 Term, 85 Harv.L.Rev. 40 at 301–315 (1971).

Where a plaintiff seeks to enjoin the enforcement of a state law, have it declared unconstitutional, and enjoin pending and further prosecutions under that law, and where his allegations are sufficient to invoke the equity jurisdiction of a federal court to protect federally secured rights, the three judge federal district court is required to examine the pleadings and proof in order to make the necessary findings on "bad faith prosecution," "harassment," and "irreparable injury" prior to granting or denying the requested relief. Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971), Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971). It is to this inquiry that we now direct our attention.

## II. THE FACTS SUPPORTING THE GRANTING OF INJUNCTIVE AND DECLARATORY RELIEF

This panel was convened in Brownsville, Texas, and heard evidence presented by both parties concerning all phases of the controversy. Our evaluation of this evidence must be a general one—an appraisal of the circumstances as a whole. These findings in no way constitute conclusions by this Court as to whether plaintiffs are guilty or innocent of the various offenses for which they were arrested. The reach of our appraisal embraces a constitutional evaluation of the defendants' activities throughout the strike; it attempts nothing more.

Five of the defendants are Texas Rangers, employees of the State of Texas and residents of Dimmitt County, Texas. Defendant Solis is the Sheriff of Starr County, Texas, and defendants Raul Pena and Roberto Pena are Deputy Sheriffs of that county. All three of these defendants are residents of Starr County. One of the defendants is a Justice of the Peace of Starr County, Texas, Precinct No. 1. Defendant Jim Rochester is a Special Deputy in the Starr County Sheriff's Department and a resident of Starr County. This defendant at all times material to this action was also employed by one of the privately owned farms in Starr County in a managerial capacity.

3. Justice Brennan, the author of *Dombrowski*, concurred in *Younger* because of Harris' failure to allege a bad faith prosecution. Failing this, Harris' constitutional contentions could be adequately handled by the state court. That *Dombrowski* is in harmony with the "rule" of *Younger* can be seen in Justice Brennan's opinion for the Court in Cameron v. Johnson where he stated: "*Dombrowski* recognized, 380 U.S., at 483–485, 85 S.Ct., at 1119–1120, the continuing validity of the maxim that a federal district court should be slow to act 'where its powers are invoked to interfere by injunction with threatened criminal prosecutions in a state court,' . . . . Federal interference with a State's good-faith administration of its criminal laws 'is peculiarly inconsistent with our federal framework' and a showing of 'special circumstances' beyond the injury incidental to every proceeding brought lawfully and in good faith in requisite to a finding of irreparable injury sufficient to justify the extraordinary remedy of an injunction. 380 U.S., at 484, 85 S.Ct., at 1119–1120. We found such 'special circumstances' in *Dombrowski* . . . . In short, we viewed *Dombrowski* to be a case presenting a situation of the 'impropriety of [state officials] invoking the statute in bad faith to impose continuing harassment in order to discourage appellants' activities . . . .' 380 U.S., at 490, 85 S.Ct., at 1123." 390 U.S. 611, at 618–619, 88 S.Ct. 1335, at 1339–1340, 20 L.Ed.2d 182.

Plaintiffs contend that these defendants, acting in concert, unlawfully combined and conspired to deprive them of their civil rights.

The United Farm Workers Organizing Committee, AFL–CIO, instituted the strike on June 1, 1966, in an attempt to organize farm workers in Starr County. The strike lasted about thirteen months and received State and nationwide publicity, particularly during the period in which a Senate Investigating Committee held hearings in the area. In furtherance of the strike, picketing occurred every day (with the exception of Sundays) until enjoined by a State District Court. During the strike there was destruction of property belonging to the farms and property of the Missouri-Pacific Railroad Company. There were also acts of violence and threats of violence. In one instance a railroad bridge was partially destroyed by fire. Although it is inferred by defendants that this destruction and violence was caused because of the strike and by those in sympathy with it, no evidence was presented specifically in this respect. It was allegedly because of this that the Missouri-Pacific Railroad and Starr County officials requested the aid of Texas Rangers in order to preserve law and order. During this period State and local authorities made arrests on fifteen occasions in Starr County. On two occasions arrests were made in Hidalgo County and on some occasions in Cameron County. These out-of-county arrests were allegedly made because of attempted interference with the railroad's normal operation of trains in those counties.

This Court has carefully evaluated the evidence which counsel for both parties so ably presented, and we are confident that this evidence taken as a whole has provided us with the requisite perspective for determining plaintiffs' harassment charges. The record is long and involved and a lengthy summary and analysis of it all is not necessary. Our overall evaluation of the nature of defendants' actions is illustrated by the following specific incidents.

On June 8, 1966, Eugene Nelson, one of the strike's principal leaders was at the Roma, Texas, International Bridge between Mexico and the United States attempting to persuade laborers from Mexico to support the strike by refusing to work for the farms in the United States. Nelson was taken into custody by a Deputy Sheriff of Starr County and transported to the Courthouse in Rio Grande City where he was detained for some four hours without charges being filed against him. During this time he was taken before the County Attorney of Starr County who questioned him about his activities in regard to the strike and informed him that he would be under investigation by the Federal Bureau of Investigation concerning an alleged threat to blow up the Courthouse and to destroy the buses being used by local farms to transport Mexican laborers to work.

On October 12, 1966, approximately twenty-five union members and sympathizers were picketing along the side of U. S. Highway 83 adjacent to the Rancho Grande Farms. Many of them were exhorting the laborers in the field to join the strike and one of them was using a bull horn. At the request of farm officials, Deputies of Starr County arrived and ordered the pickets to disperse. Raymond Chandler, one of the union leaders, left his automobile and engaged Deputy Raul Pena in conversation concerning the validity of the order. He was arrested by Pena "because he started talking to me, you know, in very loud and vociferous language so I arrested him, yes sir." None of the others were arrested, because they obeyed the order to disperse. Although Raul Pena testified that Chandler and the others were using abusive and vulgar language, the complaint later filed against Chandler shows that the words "obscene language, vulgar language, indecent language, swearing and cursing, yelling and shrieking, exposing the person, and rudely displaying a weapon" had been deleted. This indicates that the union people were engaging in peaceful picketing along the highway right-of-way when ordered to dis-

perse. There is no evidence that the exhortations from the pickets were disturbing or disrupting the work in the fields, but only that it annoyed the crew leaders and managers of the laborers.

After his arrest, Chandler was taken to the Courthouse in Rio Grande City and a complaint for violation of Article 474 of the Vernon's Ann.Texas Penal Code was filed against him. Bond was set in the amount of $500. The maximum punishment for violation of Article 474 is a $200 fine. At that time two of Chandler's friends came to the courthouse to make bond. The evidence is uncontroverted that they were verbally abused by the Deputies and were told by Deputy Raul Pena that since they were not lawyers that they had no business in the Courthouse and that if they did not leave they would be placed in jail. Upon hearing this, they left.

Several days later, on October 24, 1966, the President of the Union in Starr County, Domingo Arrendondo, and several others were in the Courthouse under arrest. While in a hall they shouted "viva la huelga" in support of the strike. A Deputy Sheriff immediately struck Arredondo in the face, pushed him backwards and then pointed his gun at the Union President's forehead ordering him not to repeat those words in the Courthouse. The Courthouse, he said, was a "respectful place." This action apparently subdued the arrestees.

On November 3, 1966, members of the union picketed certain produce packing sheds located on the Missouri-Pacific Railroad tracks near U. S. Highway 83 outside of Rio Grande City. This was at about the time that green pepper and lettuce crops were being harvested in that area for shipment to points outside the Rio Grande Valley. The County Attorney of Starr County, after consulting with members of the staff of the Attorney General of Texas, drafted a complaint against ten union leaders and sympathizers charging a violation of Article 5154f, Vernon's Ann.Civ.St., the Texas secondary picketing statute. This complaint was filed by Deputy Roberto Pena on November 9, 1966. Prior to this time, following the burning of a railroad bridge, the County Atttorney had requested law-enforcement assistance from the Governor and the Department of Public Safety. Several Texas Rangers under the command of Captain A. Y. Allee were sent to the area around La-Casita Farms. On November 9th the warrants of arrest for the November 3rd violation of Article 5154f were served by the Rangers. One of those taken into custody by the Rangers was Reynaldo De La Cruz. The evidence is undisputed that while he was under arrest, two Rangers advised him that he could work for the La Casita Farms for $1.25 an hour (the wage demanded by the union at that time) and later on they could organize a more peaceful union. De La Cruz was further advised that the Rangers were there to break the strike and would not leave until they had done so.

Another instance of selective law enforcement occurred at the Starr County Courthouse about 9.30 in the evening on January 26, 1967. Earlier in the day five union members had been arrested along the Rio Grande while trying to convince employees of Trophy Farms to join the Union. That evening approximately twenty union supporters gathered at the courthouse and conducted a prayer vigil for the apparent purpose of protesting the arrests and demonstrating union solidarity. Two members of the group, Reverend James Drake and Gilbert Padilla, mounted the courthouse steps and engaged in prayer. Responding to the jailer's report that a crowd had gathered, Deputy Raul Pena arrived and ordered the group to leave the courthouse grounds. They did so, but Drake and Padilla remained on the steps. Deputy Pena then arrested them for unlawful assembly. From the testimony of witnesses and stipulations of the parties it appears that the courthouse grounds had been used in the past for night rallies and dances, some of which took place at this entrance and some at the opposite entrance. These events were staged under the aegis of either permit or custom

and occurred without incident. While a permit was not obtained by this union group, it is plain that permits were not required for all such gatherings. The hour was not late. The group was not large. The activity was peaceful and did not endanger public safety. The participants left in an orderly manner when requested to do so. The record is clear that the union's nocturnal meeting was treated differently from other gatherings which were more frivolous and racous in nature. The enforcement exhibited here is reminiscent of that encountered in Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953), and can only be characterized as "biased" or "selective."

The Court recognizes that the courthouse jail contained five union men as prisoners and that the community was becoming restive. However, it seems that the situation could have been controlled by more observation instead of abrupt action which broke up a peaceful assembly.

On February 1, 1967, Jim Rochester, a manager of La Casita Farms who was also a special deputy of Starr County, received a radio message that union people were in or close by the field in block 55 of La Casita Farms. One side of block 55 is bordered by a private road maintained by the farm. On one side of the road are the La Casita fields and on the other side is private property owned by a Thomas Bazan. Rochester drove down this road and observed a number of people standing on the Bazan property, others in the road and on the edge of the La Casita field. As he drove past them on the road the people all moved back onto the Bazan property away from La Casita. Rochester called his office and had his timekeeper notify the Sheriff's office. Rochester observed the people shouting to about fifty or sixty laborers in the field and although he could not understand them, he assumed they were soliciting the laborers to stop work. Shortly thereafter two deputies arrived and on ascertaining that the group was made up of union members and sympathizers engaged in exhorting the laborers to join the strike, arrested nine of them. Five of this number were Roman Catholic Priests wearing clerical collars. At the time of their arrest two demonstrators ran into the brush on the Bazan property. Rochester, acting in his capacity as a special deputy, gave chase and captured one of them. The deputies then took all of those in custody to the Courthouse where they were charged with disturbing the peace. At the Courthouse they were informed by the Justice of the Peace on instructions from the County Attorney that if they ever appeared in that Court again under the same charge they would be placed under a peace bond and if the bond was not met they would be placed in jail. The evidence does not show that the demonstrators did any more than shout at the laborers in the field, who at the time of the arrest were some hundred yards away and working away from them. The substance of the exhortation was to the effect that the workers were slaves and that they should quit work. Rochester testified that he did not tell the deputies he wanted any particular charges filed or that he wanted the group arrested for trespassing on La Casita property.

On the morning of May 11, 1967, several of the union leaders were at the Camargo International Bridge with several Texas Rangers and Captain Allee. The union people were picketing the bridge where Mexican laborers were being brought into the United States by bus to work on the farms. At that time Captain Allee informed the strikers that he could get them all a job for a dollar and a quarter an hour within the next ten minutes.

On the next day, May 12, 1967, pickets gathered on private property adjacent to La Casita Farms. At the request of La Casita, Captain Allee, four Rangers and two Deputy Sheriffs drove to the area. The evidence is in dispute as to whether Allee instructed the pickets not to converse with the laborers in the fields. However, the Rangers made a thorough

investigation in order to determine whether or not the pickets were on the property adjacent to La Casita with the permission of its owner, a Mr. Solis. Captain Allee then checked to make certain that the pickets were at least fifty feet apart and in accordance with Article 5154d. After picketing a short time under the watchful eye of the officers, the pickets attempted to leave, but found that the county-maintained road separating the Solis and La Casita properties was blocked by one of the Sheriff's automobiles. The pickets were detained by a Deputy Sheriff until he determined that they had Captain Allee's permission to leave the area.

Later that same day, Eugene Nelson was arrested and charged with threatening the life of certain Texas Rangers. While he did not take the "threat" seriously, Captain Allee directed that charges be filed to protect the Rangers from censure if something happened to Nelson. Later in the day, a Friday, an attorney tendered to the Deputy Sheriff Raul Pena a bond in the appropriate amount signed by a Joseph Guerra as surety. Although the deputy personally knew Guerra to be a well known land owner and person of substance in Starr County that had acted as surety on the bonds in the past, he refused to accept the bond until the following Monday when tax records reflecting land ownership were shown to him. The evidence is clear that there was no valid reason for not accepting the bond on Friday when it was tendered.

On May 26, 1967, fourteen pickets were arrested in two groups at Mission, Texas. They were initially charged with trespassing on private property, but this charge was later changed to unlawful assembly. Three days later these charges were superseded by secondary picketing and boycott charges filed by agents of the Missouri-Pacific Railroad. The first group of ten persons was arrested by Texas Rangers when they allegedly attempted to block a train carrying produce from the Valley. Later that evening the Reverend Edgar Krueger, a leader of the strikers, and three others arrived and began trying to organize other pickets. As another train passed through, Krueger and another union member, Magdaleno Dimas, were placed in custody by the Rangers. After being arrested, Krueger and Dimas were taken toward the passing train and the evidence confirms that as they waited for it to pass, the Rangers held both of their prisoners' bodies so that their faces were only inches from the train. Two others were also arrested, including Mrs. Krueger. During the arrests, Rangers confiscated cameras being used by union people to photograph the event. Although the evidence is disputed as to whether the first arrest of ten pickets was justified under the circumstances, it is clear that the second arrest of Mr. and Mrs. Krueger was not. At best it appears that Krueger urged Allee to arrest him since he had arrested the others and the Ranger complied. Krueger was not on the tracks, but had been urging bystanders to resume the picketing. Mrs. Krueger was charged with secondary picketing although the evidence is undisputed that she was arrested either for taking a picture of her husband's arrest or attempting to strike Captain Allee with her camera in her husband's defense. After the arrest the prisoners were roughly handled by the Rangers, and Krueger was advised that he should stop his picketing and strike activities as such activities were not consistent with his ministerial functions.

This second arrest is all the more peculiar, because the testimony of the arrestees and the officers shows that the four did not have signs and were not picketing or physically blocking the track, but were trying unsuccessfully to encourage bystanders to picket. Simply put, the only justification for the second arrest was that Rev. Krueger and his companions were encouraging persons to picket. The record also shows that they were charged with secondary picketing and boycotting upon the complaint of Sam Rogers, a Special Agent of the railroad. (Pltf. Ex. 7.20C). However, Rogers was not present at this second inci-

dent as he had gone to the county seat to make a complaint against the first ten arrestees. When solicited by the officers to make the complaint against the Kruegers, Dimas and Adair, he did so without any knowledge whatsoever of the events which precipitated the arrests. (Tr. 703–705). Similarly, on December 28, 1966, Deputy Sheriff Raul Pena had filed charges against Reynaldo De La Cruz for impersonating an officer by wearing a badge in and around the Union Hall, without ever seeing the offense. (Tr. 634). The badge in question was of the shield-type, while the badges worn by the deputies and Rangers are stars. In answer to interrogatories Pena indicated that he was aware that De La Cruz and Pedro Dimas had worn similar badges when directing traffic at union functions.

On May 31, 1967, four carloads of Texas Rangers and Deputy Sheriffs arrived at La Casita Farms. At that time ten pickets had put their signs away and were resting in the shade of their cars which were parked along side the county road. The evidence is in dispute as to whether the pickets were shouting to the laborers in the fields. Three other pickets, two men and a woman, were farther down the road, using a loud speaker to exhort the workers to join the union. At the same time a truck owned by La Casita was playing music over a loud speaker to drown out the words of the pickets. There was no interference or obstruction of any traffic on the road or into the farm. Immediately upon his arriving at the scene, Captain Allee ordered the arrest of all the pickets, including those who were resting beside their cars in the shade. The reason for these arrests was that they were allegedly violating the mass picketing statute and Allee was afraid of violence because the laborers were all carrying knives which they were using in their work.

On the evening of June 1, 1967, two of the named plaintiffs, Magdaleno Dimas and Benjamin Rodriguez, were arrested by Captain Allee after a long search that led to the home of another

named plaintiff, Kathy Baker. The Rangers had searched all evening for Dimas to arrest him for allegedly brandishing a gun in a threatening manner in the presence of Special Deputy Rochester at the La Casita Shed. They found him by "tailing" two Union people, William Chandler and Alex Moreno, from the Union Hall to Kathy Baker's house with their car lights turned off. The Rangers had neither an arrest warrant nor a formal complaint on which a warrant could be based, so they put in a radio call for a Justice of the Peace and waited across the road. Dimas soon emerged from the house with Chandler and Moreno. Dimas had just picked up his .22 rifle which had been leaning on the porch wall, and as the three were leaving the house the Rangers turned on their car headlights and moved toward them with shotguns leveled. Chandler testified that he told Dimas to drop the gun because he was afraid that if the Rangers saw it, they would open fire. Dimas dropped the gun and began to walk back toward the house. Chandler said: "The next thing that happened, I noticed that the Rangers were drawing a bead on Magdaleno. I then yelled, 'Don't shoot.' And they didn't shoot." (Tr. at 335). Dimas ran into the house but the Rangers did not follow. The Rangers then approached the house and without saying a word, Captain Allee jabbed Moreno in the ribs with the point of his shotgun barrel, grabbed him by the neck and shoved him hard. Both Moreno and Chandler were arrested with no reason given. They were later charged with assisting Dimas to evade arrest. However, by his answers to interrogatories and his own testimony Captain Allee never told these men that he sought to arrest Dimas. Instead, he told them that he was looking for Dimas and wanted to prevent a killing.

When the Justice of the Peace arrived he filled out a search warrant on forms he carried with him. The Rangers then broke into the house and arrested Dimas and Rodriguez in what appears to this Court to be a violent and brutal fashion. Captain Allee admitted that he struck

Dimas on the head with his shotgun barrel once, but he testified that neither man was hit or kicked at all except for that one blow. He also testified that both men fell when they attempted to run from the room and collided with a door and each other at the same time.

The following day two physicians examined Dimas and Rodriguez, and on June 6, 1967, Dimas was examined by a third doctor. Their reports reveal a very different picture from Allee's.

Dimas was hospitalized from June 2nd through June 6th. He suffered a brain concussion, multiple bruises on both sides of the neck and other bruises behind his left ear, on his left side, on the right side of his back, on his left forearm and left wrist. Dr. Casso testified that X-ray negatives revealed that Dimas had received a severe blow to the lower right portion of his back causing the spine to curve out of shape away from the impact point. Dimas also sustained a laceration which required four stitches to close.

Rodriguez had cuts and bruises behind his right ear, bruises on his right elbow, on his right upper arm, on the right upper portion of his back and on his right jaw. His left little finger was broken and the nail was torn off.

It is difficult indeed for this Court to visualize two grown men colliding with each other so as to cause such injuries.

It is the opinion of this Court that the superiors of the strike were on several occasions restrained by defendants from lawfully exercising their rights under the Constitution of the United States. By their words and actions both local and State authorities exhibited their personal bias and opinions against the strikers and their cause. The most striking evidence of this was the regular distribution of a violently anti-union newspaper by the Starr County Sheriff's office. Each week some one hundred copies of *LaVerdad* were picked up at the bus station by a deputy in an official car and taken to the Sheriff's office. Thereafter they were distributed locally by various deputies.

Another example of the attitude of the authorities was their selective enforcement of the laws during the strike. On May 11, 1967, David Lopez, a field representative of the AFL–CIO attempted to talk to Ranger Jack Van Cleve about the strike. Van Cleve refused to speak to him and pushed him backwards with considerable force. The Reverend Mr. Krueger was with him at that time and was also shoved back by Van Cleve. The evidence is indisputed that neither of the men were demonstrating or blocking the road at that time. Both Krueger and Lopez later attempted to file charges of assault against the officer. The County Attorney of Starr County testified that he "looked into the matter" but felt there was insufficient evidence to go forward with the complaint. It does not appear that any of the bystanders or union people present were interviewed in this regard.

On the other hand, whenever complaints were filed by the officers or others against union activities these charges were always followed by quick action by the local authorities. On December 28, 1966, pickets gathered at the entrance of La Casita; an employee of La Casita, Manuel Balli, was driving a pickup truck into the farm when Librado De La Cruz, one of the pickets, reached through the truck's open window and apparently attempted to grab Balli by his coat. The attempt failed and Balli drove on through the entrance. Deputy Sheriffs immediately arrested De La Cruz and charges of assault were filed in the State Court. It is also of importance to note that this is the strongest evidence presented to the Court of an assault on anyone by union people during the strike.

Looking at the circumstances as a whole, it is the conclusion of this Court that the unjustified conduct of the defendants had the effect of putting those in sympathy with the strike in fear of expressing their protected first amendment rights with regard to free speech and lawful assembly. The conclusion is inescapable that these officials had con-

cluded that the maintenance of law and order was inextricably bound to preventing the success of the strike. Whether or not they acted with premeditated intent, the net result was that law enforcement officials took sides in what was essentially a labor-management controversy.

This is not intended as a whitewash of the activities carried on by the union and its sympathizers during this period. In a controversy such as this, it is rare indeed if all the blame can be laid to rest at one doorstep. However, the issue that is presented to this court for determination is whether the defendants stepped over the line of neutral law enforcement and entered the controversy on one side or the other. It is the judgment of this Court that such was the case.

### III. THE "YOUNGER" TESTS

As noted above in Part I of this opinion, Younger v. Harris, *supra,* makes it clear that the principles enunciated in Dombrowski v. Pfister, *supra,* for the enjoining of state criminal processes in the protection of free speech do not apply where the only danger, real or imagined, is the "chilling" of free expression incidental to the good faith prosecution of violations of state penal provisions, even where those laws are facially unconstitutional. The facts exposed by the record in this case fall short of good faith prosecution and, in the opinion of this Court, amount to irreparable injury to these plaintiffs since they cannot eliminate the threats to their rights as citizens in a criminal prosecution.

The arrests, detentions without the filing of charges, seizures of signs, dispersals of pickets and demonstrators, the threats of further prosecutions if pro-union activities did not cease, the abuse of the bonding process, and the inducements offered by peace officers to strikers to return to work, disclose a pattern of action by local authorities designed to halt the strike and to discourage attempts to engage in constitutionally protected conduct in support of the strike. The union's efforts collapsed under this pressure in June of 1967 and this suit was filed in an effort to seek relief. Since that time the union has not engaged in organizational activities. To the extent that the farm workers were forced to abandon activity to better their lot which is protected by the First Amendment they have endured irreparable harm.

Arrests followed by release without the filing of charges prevent those arrested from asserting their constitutional rights in defense of their conduct and obtaining a review of the state law. Similarly, the dispersal of pickets under the threat of arrest effectively prevents a test of the state law and a review of their conduct and that of the police. Multiple recurring arrests under these challenged statutes likewise reduce the efficacy of protecting constitutional rights of free speech and assembly in a single prosecution, since the statutes can be used repeatedly to discourage similar expressions and assemblies even after the successful defense of a single prosecution.

Threatened government reprisals and promised rewards are not susceptible to challenge through the defense of a criminal prosecution. In the former, because the threat is so effective in discouraging the unpopular conduct. In the latter, because no prosecution can result from either the acceptance or rejection of the inducement.

The injury to the plaintiffs' constitutional rights of free speech and assembly is all the more acute, since the tactics do not have to be directed at a particular person in order to diminish his ability to freely express himself. Even though no attempt is made to intimidate him, or if made it is unsuccessful, still his opportunity and ability to be heard and to join with others in pressing for mutual goals is damaged by depriving him of the support of other like-minded persons who are effectively intimidated. It is often difficult to "stand up and be counted." Human beings like to feel that they are not alone and are reticent to act singly. This is especially so when their ideas are

opposed by those in authority. If at Lexington green all but John Parker had given·ground when Major Pitcairn order-· ed the colonists to disperse, it is doubt- ful that his stand would have been effec- tive at all.

As a general rule, a litigant may assert only his own constitutional rights or immunities. McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). However, in order to be exercised with any effect the most important of these rights, because they are communicative, require not only op- portunity, but others to whom the exer- cise can be directed. Thus freedom of speech includes the freedom to hear, and freedom of the press has the freedom to read as its corollary. Antieu, Modern Constitutional Law (1969), p. 4, § 1:1. Similarly, the right to assemble is both a personal and collective right, and abridgement of that right by dissuading others from exercising it effectively curtails its exercise by an individual who is not intimidated.

In so far as the plaintiffs are deprived of this power of cohesion they are in- jured in the *exercise* of their constitu- tional rights above and beyond the in- jury to their individual rights to free speech and assembly in the abstract. While each one may be able to vindicate his conduct by raising his constitutional rights as a defense to a single criminal prosecution, this will not safeguard the collective exercise of those rights or pro- tect the individual from further harass- ment under the circumstances presented here.

In Duncan v. Perez, 321 F.Supp. 181 (E.D.La.1970) aff'd 445 F.2d 557 (5th Cir. 1971) cert. den., 404 U.S. 940, ·92 S.Ct. 282, 30 L.Ed.2d 254 (1971), the District Court enjoined a reprosecution of Gary Duncan, a Negro on a charge of simple battery after his first con- viction was reversed for denial of trial by jury. The Court found that the prosecution of Duncan was in bad faith and for the purpose of harassment. In reaching this conclusion the Court noted the multiple arrests of Duncan, the un-

usually high bond, the unusually high sentence, the demand for double bond, the arrest of his attorney, and the comments and attitude of local of- ficials. These factors indicated that the local authorities had used the crim- inal process to punish Duncan for his exercise of federally secured rights in the civil rights movement. The Dis- trict Court gave two other reasons for enjoining the prosecution: the non- existence of a legitimate state interest in reprosecuting Duncan; and the deterence and suppression of the exer- cise of federally secured rights by Negroes in Plaquemines Parish if Dun- can was brought to trial again. On ap- peal, the Court of Appeals affirmed and held that under Younger v. Harris

"an individual is not entitled to federal injunctive relief against a state prose- cution which has been instituted by state officials in good faith unless irreparable injury to the state court defendant (as shown in Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22) can be estab- lished. On the other hand, should the state court defendant be able to estab- lish that the state prosecution has been instituted *in bad faith and for purposes of harassment* . . . ir- reparable injury need not be shown provided there is present a basis for federal jursdiction, e. g. Title 28, U.S.C., Sec. 1343 and Title 42, U.S.C., Sec. 1983." 445 F.2d 557, 559–560 (5th Cir. 1971). Emphasis in original.

Thus, the requirements of Younger v. Harris for the enjoining of state criminal prosecutions by a federal court may be met in one of two ways. Here, we find that these plaintiffs have met both of these tests in that they have established the existence of bad faith prosecutions as well as irreparable injury to their own federally protected rights and those of their class. The bad faith on the part of the local authorities can be seen in facts set out above in Part II and in the discus- sion of "irreparable injury" in this part.· The authorities have prevented the plain- tiffs from defending their conduct by·

causing crowds to be dispersed under threats of arrest, by arresting persons and then releasing them without filing charges, by abusing the bond system, by filing numerous charges against the plaintiffs, by refusing to file complaints made by the plaintiffs, by supporting a private anti-union newspaper, by the comments and threats made to union supporters in custody, union supporters seeking to file charges, union supporters on picket lines, and union supporters engaging in no activity whatsoever, all for the purpose of breaking up the strike and preventing persons from advocating support for the strike and its principles. The police authorities were openly hostile to the strike and individual strikers, and used their law enforcement powers to suppress the farm workers' strike.

Having determined that the prosecutions involved here were instituted in bad faith and for the purpose of harassment, that the plaintiffs' exercise of their constitutional rights has been irreparably injured, and that the situation is one in which the defense of the State's criminal prosecutions cannot adequately vindicate those rights, we now move on to a consideration of the various Texas statutes which provide the basis for the charges against the plaintiffs.

## IV. THE CHALLENGED TEXAS STATUTES

The next matter to be determined is whether Articles 5154d, § 1 and 5154f of Vernon's Texas Civil Statutes and Articles 439, 449, 474, 482 and 784 of Vernon's Texas Penal Code are unconstitutional on their face.

Plaintiff's complaint prays for the entry of a declaratory judgment pursuant to 28 U.S.C.A. § 2201 that these seven Texas Statutes are facially uncon-

stitutionally vague and broad. It is our first duty in response to this prayer to determine whether under the facts "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." [4] In this Court's judgment, the evidence clearly shows a "substantial controversy." Not only are plaintiffs now facing charges in the Texas courts under these statutes but the evidence shows that these statutes were employed as a tool for the continuous harassment of plaintiffs. The threat of similar acts in the future lingers on. This controversy is ripe for declaratory relief if such is warranted.[5]

Defendants have advanced the position that we should abstain from consideration of the constitutional questions in favor of a State court construction of these statutes. It should be noted that the abstention doctrine should be applied only where "the issue of state law is uncertain." Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965) and "only in narrowly limited 'special circumstances'." Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444. Abstention is especially inappropriate where a statute is attacked for facial invalidity in light of the First Amendment. *See,* Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) and Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). In this Circuit the policy militating against abstention has been stated in this wise:

". . . [E]ven if it be assumed that a state court could resolve the overbreadth problems, either by means of 'an acceptable limiting construction readily to be anticipated' or by

---

4. Golden v. Zwickler, 394 U.S. 103, 118, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), quoting, Maryland Casualty Co. v. Pacific Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). *See also* Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

5. Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), applies the Younger v. Harris injunction requirement to the area of declaratory judgments. These prerequisites for considering both injunctive and declaratory relief are met here.

voiding the statute on its face, abstention is nevertheless inappropriate. In such a situation the state courts would simply be deciding a federal constitutional issue within the framework of construing state law. A primary motive for abstaining—avoidance of constitutional issues—is not served. The issue is simply referred to another forum. The state courts, however, possess no special institutional competence to decide such issues. Since the federal courts are at least as adequate a forum, no real purpose would be served by denying a litigant his choice of a federal forum."

Hobbs v. Thompson, 448 F.2d 456, 463 (5th Cir. 1971)

▮ Furthermore, this Court has stayed its hand for some four and one-half years. During this time we have not been shown a state interpretation narrowing or voiding these statutes on federal constitutional grounds in the intervening years. If abstention was ever appropriate it is no longer. Since we find no "special circumstances" requiring abstention or further delay, we proceed to the merits of the plaintiffs' constitutional challenge.

▮ The challenge to these statutes requires us to explore the constitutional limitations a state may place on public demonstrations. Picketing, marches, mass protest meetings and other assemblies have long been accorded the protection of the first amendment as "symbolic speech." Nevertheless, demonstrations are subject to greater regulation that "pure speech." Cox v. Louisiana, 379 U.S. 536, 578, 85 S.Ct. 453, 468, 13 L.Ed.2d 471, 500 (1965) (concurrence of Justice Black).[6] It is our task to evaluate the reasonableness of these Texas regulations.

▮ "Reasonableness" turns on two distinct concepts—"vagueness" and "overbreadth". Vagueness is a notice concept. A statute is considered vague under the Constitution if the meaning provided by its terminology and syntax is not sufficiently understandable to the average person so as to inform him of his rights and duties under the law.[7]

▮ "Overbreadth" has come to mean that a statute is void when a reasonable application of its sanctions could include conduct protected by the Constitution.[8] Where first amendment

6. *See also*, Fortas, Concerning Dissent and Civil Disobedience, 7–25 (1968).

7. The classic definition of "vagueness" comes from Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process . . . ." *See*, Cameron v. Johnson, 390 U.S. 611, 615–616, 88 S.Ct. 1335, 20 L.Ed.2d 683 (1968); Zwickler v. Koota, 389 U.S. 241, 249, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Ashton v. Kentucky, 384 U.S. 195, 200–201, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966); Edwards v. South Carolina, 372 U.S. 229, 238, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Wright v. Montgomery, 406 F.2d 867 (5th Cir. 1969). *See generally*, Amsterdam, The Void for Vagueness Doctrine, 109 Pa.L.Rev. 67 (1960).

8. In Zwickler v. Koota, 389 U.S. 241, 250, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967)

the Court said " 'overbreadth' . . . offends the constitutional principle that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.' NAACP v. Alabama, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325, 338." *See* Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Cantwell v. Connecticut, 310 U.S. 296, 304–307, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155 (1939); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); University Committee To End War in Viet Nam v. Gunn, 289 F.Supp. 469, 473–474 (W.D.Tex.1968) (Three-Judge Court), appeal dismissed want of jurisdiction, 399 U.S. 383, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970). *See generally*, Amsterdam, The Void For Vagueness Doctrine, 109 Pa.L. Rev. 67 (1960).

rights are concerned, the Supreme Court has made it clear that if a statute identifies the legitimate state interests which it regulates, that if a statute places only reasonable regulations on the time, place, manner and duration of activities, and that if a statute impliedly limits the discretion of those who enforce it, then it is not overbroad.[9] More generally, if it can be said of each statute that it supplies the proper criteria and standards to require *objective* enforcement of legitimate state interests, then the Constitution is satisfied. Our application of these principles will begin with Articles 5154d(1) and 5154f—the two statutes attacked by plaintiffs involving picketing.

### (A). Picketing.

■■■ Any consideration of picketing must begin with Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). In *Thornhill*, the Supreme Court held that picketing was protected first amendment activity and that it could be limited only if there was a clear danger of substantial evil. The Court's sweeping pronouncements indicated that the right to picket was very broad. However, in the years since *Thornhill*, the Court has found it necessary to place more limits on picketing, and in the process two distinct standards of regulation have been imposed: one for "public issue" picketing and another for "private issue" picketing. "Public issue" picketing involves publicizing opinions or grievances which are directed at society as a whole—the "civil dissent" demonstrations of today. "Private issue" picketing involves publicizing particular disputes; this class is confined almost exclusively to labor-dispute picketing.

Plaintiffs have attacked the constitutionality of Articles 5154d, § 1 and 5154f of V.A.T.S. which regulate "public issue" and "private issue" picketing respective-

ly. We will consider Article 5154d, § 1 first.

### ARTICLE 5154d

Section 1. It shall be unlawful for any person, singly or in concert with others, to engage in picketing or any form of picketing activity that shall constitute mass picketing as herein defined.

"Mass picketing" as that term is used herein, shall mean any form of picketing in which:

1. There are more than two (2) pickets at any time within fifty (50) feet of any entrance to the premises being picketed, or within fifty (50) feet of any other picket or pickets.

2. Pickets constitute or form any character of obstacle to the free ingress to and egress from any entrance to any premises being picketed or to any other premises, either by obstructing said free ingress or egress by their persons or by the placing of vehicles or other physical obstructions.

The term "picket," as used in this Act, shall include any person stationed by or acting for and in behalf of any organization for the purpose of inducing, or attempting to induce, anyone not to enter the premises in question or to observe the premises so as to ascertain who enters or patronizes the same, or who by any means follows employees or patrons of the place being picketed either to or from said place so as either to observe them or attempt to persuade them to cease entering or patronizing the premises being picketed.

The term "picketing," as used in this Act, shall include the stationing or posting of one's person or of others for and in behalf of any organization to induce anyone not to enter the premises in question, or to observe the premises so as to ascertain who enters

---

9. *See*, Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969);

Gregory v. Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969); Note, Regulation of Demonstrations, 80 Harv. L.Rev. 1773, 1773–74 (1967).

or patronizes the same, or to follow employees or patrons of the place being picketed either to or from said place so as either to observe them or attempt to persuade them to cease entering or patronizing the premises being picketed.

▮▮▮▮▮ *Thornhill* and the cases which followed made it abundantly clear that peaceful "public issue" picketing is protected under the first amendment as "symbolic speech"[10] so long as it is in a location generally open to the public.[11] However, this protection will shield one from arrest only if his picketing does not interfere with legitimate State interests such as the regulation of the flow of traffic on public streets and sidewalks.[12] But the State may regulate only with statutes which are narrowly

drawn, and take into account all of the nuances of time, place, manner and duration of public expression and assembly, thereby specifying the evils within the allowable area of State control.[13]

The Supreme Court employed this doctrine in the case of Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968) to approve the Mississippi Anti-Picketing Law.[14] The statute was acceptable because it was expressly limited to activity which obstructed or unreasonably interfered with ingress or egress from a building, thereby specifying the evil it was designed to prevent.

Applying these principles to Article 5154d, § 1 requires only that we compare this statute with a Louisiana Municipal Ordinance found unconstitutional by the United States Court of Appeals for the

10. *See*, Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). *See generally*, Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

11. *See*, Amalgamated Food Employers Union v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

12. *See*, Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); Poulos v. New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Shuttlesworth v. Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965); Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968). *See generally*, Fortas, Concerning Dissent and Civil Disobedience, 12–25 (1968).

13. *See*, Thornhill v. Alabama, 310 U.S. 88, 97, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), where the Court condemned a statute which prohibited almost all picketing. The Court stated that the regula-

tion "does not aim specifically at evils within the allowable area of State control, but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of press." *See also*, Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Cameron v. Johnson, 390 U.S. 611, 88 S. Ct. 1335, 20 L.Ed.2d 182 (1968); Davis v. Francois, 395 F.2d 730 (5th Cir. 1968); Note, Regulation of Demonstrations, 80 Harv.L.Rev. 1773, 1773–74 (1967).

14. The Mississippi Anti-Picketing Law, 2A Miss.Code Ann. § 2318.5 (Sup.1966), provided:
"1. It shall be unlawful for any person, singly or in concert with others, to engage in picketing or mass demonstrations in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any public premises, State property, county or municipal courthouses, city halls, office buildings, jails, or other public buildings or property owned by the State of Mississippi, or any county or municipal government located therein, or with the transaction of public business or administration of justice therein or thereon conducted or so as to obstruct or unreasonably interfere with free use of public streets, sidewalks, or other public ways adjacent or contiguous thereto."

Fifth Circuit in the case of Davis v. Francois, 395 F.2d 730 (5th Cir. 1968):

"It shall be unlawful for more than two (2) people to picket on private property or on the streets and sidewalks of the City of Port Allen in front of a residence, a place of business, or public building. Said two (2) pickets must stay five (5) feet apart at all times and not obstruct the entrance of any residence, place of business, or public building by individuals or by automobiles."

*Id.* at 732.

In holding the provision void, the Court stated:

"The present ordinance patently violates . . . [Constitutional] precepts. Its application is sweeping: It restricts 'public issue picketing' and private picketing; it restricts picketing on both the sidewalks and streets; it extends to all kinds of facilities in the city though each may present different considerations; it absolutely limits the number of picketers to two regardless of the time, place or circumstances. In so doing it 'unduly restricts the right to protest' because it does not aim specifically at a serious encroachment on a state interest or evince any attempt to balance the individual's right to effective communication and the state's interest in peace and harmony."

*Id.* at 735.

■ From *Cameron* and *Davis* it is clear that a statute regulating picketing must specifically identify the type of anti-social conduct it is seeking to prohibit when it authorizes a prohibition of a limitation upon picketing. What has been denominated the "numbers and distance" formula of Article 5154d, § 1 does not attempt to frame its authorization in the context of an evil to be prevented or a right secured, *e. g.*, to prevent violence or to assure reasonable access to a home or business. Rather the statute establishes a mathematical straitjacket which does not permit law officers or courts to take into account the factual context of a particular picket line. The most recent Texas decisions considering the statute have upheld the formula as a reasonable regulation on picketing, principally because it is not vague. Geissler v. Coussoulis, 424 S.W. 2d 709 (Tex.Civ.App.—San Antonio, 1969, error ref. n. r. e.); Sabine Area Building Trades Council v. Temple Associates, Inc., 468 S.W.2d 501 (Tex.Civ. App.—Beaumont, 1971, no writ). In both cases the courts strictly adhered to the statutory numbers and distance definition of "mass picketing." In *Geissler* the Court observed that the statute's formula was capable of rendering "otiose efforts to publicize the facts of a labor dispute by picketing and thus constitute an unreasonable interference with freedom of expression. But this does not require that the statute be relegated to the limbo of unconstitutional legislation. A statute valid as to one state of facts may be invalid as to another. [citations omitted]" 424 S.W.2d at 712. While the statutory standard is precise and objective as to the number and location of pickets, the section still presents two problems.

■ First, as observed by the *Geissler* court, strict application of the formula by law officers and courts can yield an unconstitutional restraint on protected First Amendment freedoms. Thus the Texas statute is defective for the same reasons advanced in Davis v. Francois, *supra*. Little imagination is required to envisage circumstances where groups of demonstrators, substantially larger than two persons, standing at closer quarters than fifty feet would not threaten the safe flow of traffic nor unreasonably interfere with free ingress or egress from nearby buildings.

■ Second, the statute condemns obstructions of "any character." Indeed, the injunction upheld in Sabine Area B.T.C. v. Temple Associates, *supra*, tracked the statute and prohibited any defined "mass" picketing which constituted or formed "any character of obstacle" to ingress and egress at the picketed site. 468 S.W.2d 501. Thus

once a picket comes within the statutory definition, it does not matter whether the picketing is a reasonable or unreasonable obstacle to access, it is forbidden. The statute does not permit the courts to relax its strictures and to decline to issue injunctions where the picketing does not present an unreasonable barrier to access. Nor have the Texas courts seen fit to read this kind of elasticity into the statute. This Court cannot supply such a construction. United States v. Thirty-Seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971). See, Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) and Teitel Film Corp. v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968).

■ While part two of Section 1 is similar to the language of the Mississippi statute construed in Cameron v. Johnson, *supra,* there the Court allowed the State to prohibit only "unreasonable" obstructions while Texas prohibits "any character" of obstruction to free ingress or egress. This is not the precise and narrowly drawn statute contemplated by the Supreme Court. It commands the policeman to remove any mode of free expression which presents any character of obstruction and this is impermissible.

■ Further, this statute is not narrowed by its own definitions of the terms "picket" and "picketing." Both of these definition-clauses embrace persons who attempt to induce others not to enter the picketed premises. Although not all methods of "inducing" others to change their opinions are protected, the Supreme Court has made it quite clear that demonstrations are legitimate forms of persuasion.[15] The statute is void for overbreadth.

## ARTICLE 5154f.

Article 5154f is the other challenged picketing statute.[16] It prohibits second-

---

15. *See,* Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Cameron v. Johnson, 390 U.S. 611, 88 S. Ct. 1335, 20 L.Ed.2d 182.

16. Art. 5154f. Secondary strikes, picketing and boycotts prohibited

Section 1. It shall be unlawful for any person or persons, or association of persons, or any labor union, incorporated or unincorporated, or the members or agents thereof, acting singly or in concert with others, to establish, call, participate in, aid or abet a secondary strike, or secondary picketing, or a secondary boycott, as those terms are defined herein.

Section 2. As used in this Act:

a. The term "labor union" means every association, group, union, national and local, branch or subordinate organization of any union of working men, incorporated or unincorporated, organized and existing in part for the purpose of protecting themselves and improving their working conditions, wages, or employment relationships in any manner, and shall include the local, state, national and international affiliates of such organizations or unions.

b. "Secondary strike" shall mean a temporary stoppage of work by the concerted action of two or more employees of an employer where no labor dispute exists between the employer and such employees, and where such temporary stoppage results from a labor dispute to which such two or more employees are not parties.

c. The term "picket" shall include any person stationed by or acting in behalf of any organization for the purpose of inducing anyone not to enter the premises in question; or for apprising the public by signs, banners, or other means, of the existence of a labor dispute at or near the premises in question; or for observing the premises so as to ascertain who enters or patronizes the same; or any person who by any means follows employees or patrons of the place being picketed either to or from such place so as to either observe them or to attempt to persuade them to cease entering or patronizing the premises being picketed.

d. The term "secondary picketing" shall mean the act of establishing a picket or pickets at or near the premises of any employer where no labor dispute, as that term is defined in this Act, exists between such employer and his employees.

e. The term "secondary boycott" shall include any combination, plan, agreement or compact entered into or any concerted action by two or more persons to cause injury or damage to any person, firm or corporation for whom they are not employees, by

ary strikes, secondary picketing and secondary boycotts and therefore falls within the principles of "private issue picketing."

The concept of "private issue" picketing grew, in part, out of a series of decisions by the Supreme Court that retreated somewhat from Thornhill's pronouncements on labor picketing. These cases dealt with the scope of constitutional protection of picketing in the context of State court injunctions. The retreat culminated in the case of International Bhd. of Teamsters v. Vogt, 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957). In *Vogt* the Court was called upon to review the validity of a State court injunction restraining picketing designed to induce the plaintiffs' employees to join a union. Substantial damage had resulted when sympathetic unions refused to make deliveries or haul goods for the plaintiff. The Court sustained the injunction on the ground that the purpose of the picketing was to violate a valid State policy. Mr. Justice Frankfurter's majority opinion carefully traced the evolution of this principle pointing out the many "reassessments" of the broad pronouncements of *Thornhill*. The "decisive reconsiderations", he writes, came in Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 497–498, 69 S.Ct. 684, 688, 93 L.Ed. 834 (1949). In Giboney, union ice peddlers had picketed an ice company in an effort to induce the

company to refuse to sell ice to nonunion peddlers. The Court upheld the State injunction against the picketing because "the sole immediate object of the publicizing adjacent to the premises of Empire . . . was to compel Empire to agree to stop selling ice to nonunion peddlers. Thus all of appellants' activities . . . constituted a single and integrated course of conduct, which was in violation of Missouri's valid law." The *Giboney* decision was the unanimous opinion of the Court, and it concluded that the picketing amounted to economic pressure to compel Empire to "abide by union rather than by state regulation of trade." *Id.* at 503, 69 S.Ct. at 691.

The reassessment process continued in International Brotherhood of Teamster's etc. Union v. Hanke, 339 U.S. 470, 70 S.Ct. 773, 94 L.Ed. 995 (1950) and Building Service Employees v. Gazzam, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045 (1950). The majority stated in Gazzam that "an adequate basis for the instant decree is the unlawful objective of the picketing . . . ." But then the Court concluded that *Giboney* controlled and affirmed the case on that basis. Three years later in Local Union No. 10, United Ass'n of Journeymen Plumbers etc. Union v. Graham, 345 U.S. 192, 73 S.Ct. 585, 97 L.Ed. 946 (1953), the Court found evidence to support the conclusion that a substantial purpose of the picketing was to put pressure on a

(1) Withholding patronage, labor or other beneficial business intercourse from such person, firm or corporation; or

(2) Picketing such person, firm or corporation; or

(3) Refusing to handle, install, use or work on the equipment or supplies of such person, firm or corporation; or

(4) Instigating or fomenting a strike against such person, firm or corporation; or

(5) Interfering with or attempting to prevent the free flow of commerce; or

(6) By any other means causing or attempting to cause an employer with whom they have a labor dispute to inflict any damage or injury to an employer who is not a party to such labor dispute.

f. The term "employer" means any person, firm or corporation who engages the services of an employee.

g. The term "employee" shall include any person, other than an independent contractor, working for another for hire in the State of Texas.

h. The term "labor dispute" is limited to and means any controversy between an employer and the majority of his employees concerning wages, hours or conditions of employment; provided that if any of the employees are members of a labor union, the controversy between such employer and a majority of the employees belonging to such union, concerning wages, hours or conditions of employment, shall be deemed, as to the employee members only of such union, a labor dispute within the meaning of this Act.

contractor to fire nonunion workmen and concluded the injunction was not in violation of the First Amendment.

Frankfurter summarized the evolutionary process in *Vogt:*

"This series of cases, then, established a broad field in which a State, in enforcing some public policy, whether of its criminal or its civil law, and whether announced by its legislature or its courts, could constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy."

354 U.S. at 293, 77 S.Ct. at 1171.

■ The Supreme Court has not faced these issues directly since 1957, but the Fifth Circuit has reaffirmed *Vogt* and this Court is bound to its principles.[17]

Article 5154f prohibits persons or groups who establish, call, participate in, aid or abet a secondary strike, or secondary picketing, or a secondary boycott as those terms are defined.

Section 2(d) defines "secondary picketing" as the establishing of a picket at or near the premises of any employer where no "labor dispute" exists. Article 5154f defines a "labor dispute" as any controversy between an employer and a majority of his employees. In construing Article 5154f, the Texas Supreme Court has invalidated this definition of "labor dispute"[18] under the authority of American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1941). The Court stated in Swing that:

"A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him."

*Id.* at 326, 61 S.Ct. at 570.

■ There can be little doubt that the sanction imposed by Section 2(d) is precisely that which *Swing* held to be inconsistent with the First Amendment. It clearly relies on the absence of an employer-employee relationship and this is impermissible. We, therefore, consider Section 2(d) to be an unconstitutional infringement of freedom of speech.

■ Section 2(b) defines a "secondary strike" as a temporary work stoppage by the concerted action of two or more employees, of an employer where no labor dispute exists, which results from a labor dispute in which these two employees are not parties. Section 1 prohibits not only participation in a secondary strike but also aiding and abetting a secondary strike. Little imagination is required to visualize an enforcement officer deciding that picketing "aids and abets" secondary strikes. Section 2(b), then, also contains a potential for prohibition of First Amendment rights.

Initially, it should be stated that the term "labor dispute" is also invalid in Section 2(b) as it was for Section 2(d). However, Section 2(b) is not rendered void on this basis alone since without the strict definition of "labor dispute" it is still operable. The statute then prohibits a work stoppage by two or more people which results from a labor controversy to which these two persons are not parties, and picketing could be said to "aid and abet" this by advertising the controversy.

---

17. Judge John R. Brown writing for the Fifth Circuit in Burr v. N.L.R.B., 321 F.2d 612, 621 (5th Cir. 1963) stated: "Notwithstanding sweeping and earlier broad pronouncements in terms of free speech, it is now recognized that Congress or the states may in enforcing a valid public policy, 'constitutionally enjoin peaceful picketing aimed at preventing effectuation of [a policy against coercive restraints against employers] . . . . .'"

*See also*, Wooten v. Ohler, 303 F.2d 759, 764 (5th Cir. 1962).

18. *See*, Dallas General Drivers v. Wamix, 156 Tex. 408, 295 S.W.2d 873 (1956); Construction and General Labor Union v. Stephenson, 148 Tex. 434, 225 S.W.2d 958 (1950); International Union of Operating Engineers v. Cox, 148 Tex. 42, 219 S.W.2d 787 (1949); Ex parte Henry, 47 Tex. 315, 215 S.W.2d 588 (1948).

Viewed in this posture, it becomes apparent that the regulation makes irrelevant the picketing's purpose. In order to come within the test of *Vogt*, the statute must require a showing that the purpose of the picketing was to violate a legitimate state policy. Texas has simply stated its policy here and then prohibited anyone from aiding in any manner in its violation. In so doing, the proscription sweeps in activity which the State is not entitled to prohibit.[19]

■ Section 2(e) defines a "secondary boycott" as a plan or agreement entered into or any concerted action by two or more persons to cause injury or damage to any person or firm for whom they are not employees. The section then lists the different ways in which this "plan" to "cause injury or damages" may be carried out. Picketing is one of the methods listed. Also, the "aid and abet" clause of Section 1 is again available to prohibit picketing designed to bring about injury or damage by one of the other five methods listed in Section 2(e).

Simply stated, Texas has prohibited secondary boycott picketing, the purpose of which is either to cause "injury or damage" or to encourage acts which will cause "injury or damage." These are broad terms; they do not point to specific evils. In each case considered by the *Vogt* opinion in which the State prohibition of picketing was allowed to stand, the specific evil condemned by the State was apparent: urging an employer to hire only union employees, urging an employer to not sell to nonunion salesmen, urging an employer to employ a certain percentage of people from certain races. Such evils are easily discernible.

In *Vogt*, the Court said that there was "a growing awareness that these cases involved not so much questions of free speech as review of the balance struck by a State between picketing that involved more than 'publicity' and com-

peting interests of state policy." 354 U.S. at 290, 77 S.Ct. at 1169. If this balance is to be struck by written statutes, then there is even more reason to demand clarity of purpose. The Constitution requires that limits on first amendment activity be narrowly drawn and that they isolate the specific evils they are condemning for unless we are "meticulous in that regard, great rights will be lost by the absence of findings, by the generality of findings, or by the vagueness of decrees." Local Union No. 10, United Ass'n of Journeymen Plumbers etc. Union v. Graham, 345 U.S. 204, 73 S.Ct. 591, 97 L.Ed. 946 (Douglas, J., dissenting).

The evil here is "damage or injury" of any character or degree no matter how slight or subtle. Judicial balance of this sort of "purpose" with the right to freedom of speech would be a haphazard office at best. Section 2(e) is, therefore, unconstitutionally broad.

### (B) OBSTRUCTING STREETS

Plaintiffs have also attacked Article 784 of the Texas Penal Code, which prohibits obstructing public streets. It involves many of the same issues as the picketing statutes so it will be considered at this point in the opinion.

### ARTICLE 784.

Whoever shall wilfully obstruct or injure or cause to be obstructed or injured in any manner whatsoever any public road or highway or any street or alley in any town or city, or any public bridge or causeway, within this State, shall be fined not exceeding two hundred dollars.

■■ This is a clear, precise statute drawn so as to carefully carve out a State interest worthy of protection. The Supreme Court has made it clear that the First Amendment does not protect those who intentionally interfere with traffic safety, and this statute is so limited.[20]

---

19. Thornhill v. Alabama, 310 U.S. 88, 97, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

20. It has been argued that a State or municipality may restrict its streets com-

pletely to traffic. *See* Cox v. Louisiana, ·379 U.S. 536, 555, n. 13, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

In Cox v. Louisiana, 379 U.S. 536, 85 S. Ct. 453, 13 L.Ed.2d 471, 484 (1965), Justice Goldberg said:

"One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."

In the case of Shuttlesworth v. Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965) the Court considered the constitutionality of a city ordinance which said: "It shall be unlawful for any person or any number of persons to so stand, loiter or walk upon any street or sidewalk in the city as to obstruct free passage over, on or along said street or sidewalk. It shall also be unlawful for any person to stand or loiter upon any street or sidewalk of the city after having been requested by any police officer to move on." Id. at 88, 86 S.Ct. at 212. The Court objected to the second sentence of the ordinance saying that the provisions permitted travel on a sidewalk only at the whim of a police officer. However, the Court held that a State court construction sufficiently narrowed the provision's scope by requiring a showing of an actual traffic blockage.

We consider the word "obstruct" in Article 784 to mean an actual prevention or a substantial interference with traffic; until this prevention of normal conditions occurs, the statute does not operate. Article 784 is, therefore, not contrary to *Shuttlesworth* and is not unconstitutional.

## C. BREACH OF THE PEACE

### ARTICLE 474.

Whoever shall go into or near any public place, or into or near any private house, and shall use loud and vociferous, or obscene, vulgar or indecent language or swear or curse, or yell or shriek or expose his or her person to another person of the age of sixteen (16) or over, or rudely display any pistol or deadly weapon, in a manner calculated to disturb the person or persons present at such place or house, shall be punished by a fine not exceeding Two Hundred Dollars ($200).

To answer plaintiff's allegations in regard to Article 474, this Court need not proceed past the case of University Committee to End War in Viet Nam v. Gunn, 289 F.Supp. 469 (W.D.Tex. 1968) (Three-Judge Court), appeal dismissed for want of jurisdiction, 399 U.S. 383, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970). Having been presented with the same questions in regard to Article 474 that now face this Court, the Court in *Gunn* held the statute "impermissibly and unconstitutionally broad." Id. at 475. Judge Thornberry's opinion specified two reasons for the holding. The first concerned the words "loud and vociferous":

"It cannot be doubted that the provision regarding the use of loud and vociferous language would, on its face, prohibit speech which would stir the public to anger, would invite dispute, would bring about a condition of unrest, or would create a disturbance. In so doing, the statute on its face makes a crime out of what is protected First Amendment activity. This is impermissible."

Id. at 474.

The Court also considered the clause "in a manner calculated to disturb" defective since "[i]t 'leaves wide open the standard of responsibility,' relying on 'calculations as to the boiling point of a particular person or a particular group, not an appraisal of the nature of the comments per se.'" Id. at 475.

This Court is in complete agreement with the principles of the *Gunn* opinion. We therefore consider Article 474 to be unconstitutionally broad.[21]

Plaintiffs have also attacked Article 482 of the Texas Penal Code relating to "Abusive Language."

## ARTICLE 482.

Any person who shall in the presence or hearing of another curse or abuse such person, or use any violently abusive language to such person concerning him or any of his female relatives, under circumstances reasonably calculated to provoke a breach of the peace, shall be fined not more than one hundred dollars.

Literally read, the statute makes it a crime for any person to "curse or abuse" another person "under circumstances reasonably calculated to provoke a breach of the peace . . . ." Article 482 is no less a "breach of the peace" statute than Article 474. Both require speech "in a manner calculated to provoke a public disturbance." In *Gunn*, Article 474 was found to be fatally defective because of this requirement; this Court considers Article 482 to be defective for the same reason.

Article 482 comes directly under the principles of Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966). In *Ashton* the Supreme Court reversed a conviction under the Kentucky interpretation of common-law libel which prohibited "any writing calculated to create disturbances of the peace . . . ." The Court's decision was based on the classic doctrine of Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940):

"The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others . . . . Here we have a situation analogous to a conviction under a statute sweeping in a great variety of conduct under a general and indefnite characterization, and leave to the executive and judicial branches too wide a discretion in its application."

*Id.* at 308, 60 S.Ct. at 905.

Applying this concept to criminal libel, the *Ashton* Court stated:

"Convictions for 'breach of the peace' where the offense was imprecisely defined were similarly reversed in Edwards v. South Carolina, 372 U.S. 229, 236–238, 83 S.Ct. 680, 683–684, 9 L.Ed.2d 607, 702, 703, and Cox v. Louisiana, 379 U.S. 536, 551–552, 85 S.Ct. 453, 462–463, 13 L.Ed.2d 471, 482. *These decisions recognize that to make an offense of conduct which is 'calculated to create disturbances of the peace' leaves wide open the standard of responsibility.* It involves calculations as to the boiling point of a particular person or a particular group, not an appraisal of the nature of the comments per se. This kind of criminal libel 'makes a man a criminal simply because his neighbors have no self-control and cannot refrain from violence.' "

384 U.S. at 200, 86 S.Ct. at 1410. Emphasis added.

21. Since the submission of this case the Texas Legislature has amended Article 474 of the Penal Code to define eleven instances of punishable "disorderly conduct." Acts 1969, 61st Leg., p. 1510, ch. 454, § 1, emerg. eff. June 10, 1969. The amended statute, for the most part, is aimed at violent *behavior*, such as interference with public meetings and speakers, and with judicial and legislative proceedings. As such it is a very different statute from the old Article 474, under consideration here, which makes speech itself an offense. The validity of the new statute is not before this Court since the plaintiffs are not charged with its violation, nor can they be, because of the *ex post facto* provisions of the federal and state constitutions. However, the old statute is still in existence for the purposes of any pending prosecutions and the challenge to its validity is not mooted by the enactment of the new article.

These principles were recently reiterated by the Supreme Court when it considered the Georgia "abusive language" statute, Georgia Code § 26–6303, which provides "any person who shall, without provocation, use to or of another, and in his presence . . . opprobrious words or abusive language, tending to cause a breach of the peace . . . shall be guilty of a misdemeanor." Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). Since the Georgia law had not been construed by Georgia courts as being limited to the "fighting words" prohibition permitted by Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), the law was held to be facially unconstitutional. The Texas statute under consideration here contains the same expansive language unlimited by a narrowing interpretation.[22] Consequently, Article 482 is also void for overbreadth.

### (D). UNLAWFUL ASSEMBLY.

Finally, it is contended that Articles 439 and 449 are facially unconstitutional.

Chapter One, Title Nine of the Texas Penal Code is entitled Unlawful Assemblies. The chapter's first provision is Article 439 and it defines "Unlawful Assemblies." The remaining twenty-two articles set forth various purposes for which such assemblies may be had and affix various punishments for such unlawful acts.[23] Apparently, the pleader must combine Article 439 with one of the other "offense" articles in the chapter, such as Article 449, in order to frame a complete criminal indictment.[24]

The peculiar method of drafting statutes does not present any unusual problems since our approach to Article 439 does not require that we combine the two statutes or that we even consider Article 449 at all. This Court will assume for purposes of this opinion that Article 449, as well as the remaining twenty-one articles of Chapter One, Title Nine, provides a legitimate state interest which if reasonably applied would be an acceptable restriction on First Amendment privileges.

22. The only decision which approximates the *Chaplinsky* doctrine is Deaton v. State, 53 Tex.Cr.R. 393, 110 S.W. 69 (Tex.Cr.App.1908) where it was stated that "the purpose of the statute [is] both to discourage and punish the use of abusive language in respect to matters in controversy, the effect of which would and might be to provoke breaches of the peace and to cause bloodshed." Id. at 70. In *Deaton* the defendant's offense had been to swear at a trespasser, who was gathering pecans on the defendant's property, in the presence of the trespasser's sisters. In Bumgarner v. State, 64 Tex.Cr.R. 165, 142 S.W. 4 (Tex.Cr.App.1911) the defendant had driven his stepdaughters from his house by calling them "liars," "bitches," and "whores" to their faces. In Easter v. State, 71 Tex. Cr.R. 370, 160 S.W. 74 (Tex.Cr.App. 1913) the unfortunate defendant had had the temerity to call a man a "liar" when he accused the defendant of not paying a debt. The fellow walked away and then returned with a plank with which he beat the defendant breaking his collar-bone. The defendant's conviction was affirmed. The only post-Chaplinsky case, Duke v. State, 168 Tex. Cr.R. 403, 328 S.W.2d 189 (Tex.Cr. App.1959) makes no mention of the "fighting words" limitation. It is obvious that the statute's purpose, as written and interpreted, was to protect the ears of a more innocent age and that its scope is much wider than the "fighting words" coverage permitted by *Chaplinsky*. The *Chaplinsky* "fighting words" exception itself has been criticized as a concept "so vague that no lawyer can adequately guide his client contemplating a public speech." Antieau, Modern Constitutional Law (1969), § 1:7, p. 23.

23. Art. 449. To prevent any person from pursuing his labor.
 If the purpose of the unlawful assembly be to prevent any person from pursuing his labor, occupation or employment, or to intimidate any person from following his daily avocation, or to interfere in any manner with the labor or employment of another, the punishment shall be by fine not exceeding five hundred dollars.

24. Ex parte Brachey, 142 Tex.Cr.R. 332, 152 S.W.2d 763, 764 (Tex.Cr.App.1941).

ARTICLE 439.

An "unlawful assembly" is the meeting of three or more persons with intent to aid each other by violence or in any other manner either to commit an offense or illegally to deprive any person of any right or to disturb him in the enjoyment thereof.

This statute in effect provides that an unlawful assembly is a meeting of three or more persons with intent to aid each other to deprive any person in any manner of a right which this Court has assumed the State may legitimately protect.

 The statute comes within the principles stated by the Supreme Court in the case of United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967):

"The statute quite literally establishes guilt by association alone, without any need to establish that an individual's association poses the threat feared by the Government in proscribing it. The inhibiting effect on First Amendment rights is clear."

This case makes it clear that statutory regulation of assembly must establish standards for identifying a threat to the public which is so important that it justifies inhibiting first amendment freedoms. The Constitution protects those who congregate with others for the purpose of peacefully discussing unlawful pursuits.[25] Any provision regulating assembly must require that an individual intend to actively further the criminal aims of the assembly[26] and must also demand that before an assembly can be prohibited, these criminal aims must be manifested so as to pose a threat of substantial degree to public order.[27] But, a statute cannot punish assembling with

25. Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). See, Hunter v. Allen, 286 F.Supp. 830, 836–837 (N.D.Ga.1968): "The court is constrained to believe that the First Amendment permits assembly even for unlawful purposes so long as it is limited to a peaceable discussion of such purpose." Hunter was affirmed by the Fifth Circuit at 422 F.2d 1158 and then reversed by the Supreme Court, Embry v. Allen, 401 U.S. 989, 91 S.Ct. 1237, 28 L.Ed.2d 528 (1971) in light of the Younger cases. See also, Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1948); Garner v. Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961) (Harlan, J., concurring); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

26. United States v. Robel, 389 U.S. 258, 256–266, 88 S.Ct. 419, 424–425, 19 L.Ed. 2d 508 (1967): "That statute casts its net across a broad range of associational activities, indiscriminately trapping membership which can be constitutionally punished and membership which cannot be so proscribed. It is made irrelevant to the statute's operation that an individual may be a passive or inactive member of a designated organization, that he may be unaware of the organization's unlawful aims, or that he may disagree with those unlawful aims." See, Rollins v. Shannon, 292 F.Supp. 580, 592 (E.D.Mo.1968) (Three-Judge Court) vacated 401 U.S. 988, 91 S.Ct. 1235, 28 L.Ed.2d 527 (1971).

27. United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); In Rollins v. Shannon, 292 F.Supp. 580, footnote 26 supra, the court stated in upholding a Missouri unlawful assembly provision that the statute was valid because it could only be employed "when the intent to commit criminal acts with force and violence is manifested." (Emphasis added). Id., at 592. The case of Devine v. Wood, 286 F.Supp. 102 (M.D. Ala.1968) (Three Judge Court) would appear to support this position since the court upheld a statute which required that the assembly be conducted in such a manner as to cause persons to reasonably believe the peace would be disturbed. Cf., Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940): "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the

an evil state of mind; it must require this sort of "overt act."

■ The Texas unlawful assembly statute makes no effort to limit its effect to assemblies which pose a threat to public order.[28] Indeed, quite the contrary is accomplished by condemning not only violence but "any other manner" of effecting the assembly's unlawful purposes.

■■ The phrase "any other manner" breeds another defect. Violence is, of course, not protected by the First Amendment.[29] However, the Court has also ruled that if a regulation's scope covers peaceful as well as violent conduct, the State interest which requires restricting freedom of assembly must be carefully specified and that only reasonable restrictions may be placed on the time, place, duration, or manner of such conduct.[30] The Texas statute's prohibition of assembly by violence is proper, but when it goes on to include non-violent conduct by way of the "any-other-manner" clause without narrowing its impact through reasonable and objectively drawn restrictions as to the time, place, duration, manner and circumstances of assembly, it "sweeps unnecessarily broadly and thereby invade[s] the area of protected freedoms",[31] so that it leaves too much discretion to the enforcer of the statute.[32]

Article 439,[33] along with Articles 474 and 482 of the Penal Code and Articles 5154d, § 1 and 5154f of the Civil Statutes, is void for overbreadth.

power of the State to prevent or punish is obvious." Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066 (1937); Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951).

28. The Supreme Court has found the Ohio Criminal Syndicalism statute unconstitutional. In a per curiam opinion the Court held:
"Accordingly, we are here confronted with a statute which, by its own words and as applied, purports to punish mere advocacy and to forbid, on pain of criminal punishment, assembly with others merely to advocate the described type of action. Such a statute falls within the condemnation of the First and Fourteenth Amendments."
Brandenberg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed. 430 (1969). The Brandenberg case proceeded through the Ohio judicial system and was appealed to the U.S. Supreme Court. On the other hand, Younger began in the federal system.

29. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951); Devine v. Wood, 286 F.Supp. 102, 106 (M.D. Ala.1968) (Three-Judge Court); Rollins v. Shannon, 292 F.Supp. 580, 591 (E.D. Mo.1968) (Three-Judge Court) vacated 401 U.S. 988, 91 S.Ct. 1235, 28 L.Ed.2d 527 (1971).

30. Cox v. Louisiana, 379 U.S. 536, 558, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). See, Note, Regulation of Demonstrations, 80 Harv.L.Rev. 1773, 1773–74 (1967).

31. Zwickler v. Koota, 389 U.S. 241, 250, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). See also, NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 307, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964).

32. See, Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 407, 16 L.Ed.2d 469 (1966); Shuttlesworth v. Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

33. Defendants have urged that our decision regarding Article 439 should be controlled by the case of Lichten v. State, 434 S.W.2d 128 (Tex.Cr.App.1968). The appeal in Litchen was dismissed "for want of a substantial federal question" by the Supreme Court of the United States. Lichten v. Texas, 393 U.S. 86, 89 S.Ct. 259, 21 L.Ed.2d 218 (1968). This court considers this dismissal an affirmance of the lower court's result only, and since neither the Supreme Court nor the Texas Court of Criminal Appeals discussed the applicable constitutional principles we are persuaded to move on to our own consideration of the merits of plaintiff's challenge to this statute.

634

Our decision to invalidate these statutes has involved a careful and cautious balancing of the individual's right to speak with the right of all citizens to be safe on American streets. The laws that punish those who offend either of these precious rights are continually in need of maintenance and repair. Especially in these times of strife and unrest, the Legislature of this State must be sensitive to the goals of a changing society. Of the five statutes we here declare unconstitutional, *two are twenty-five years old, two have been on the books forty-seven years* and the last one was promulgated *eighty-five years ago.* No longer do they serve the purposes for which they were enacted or the Constitution of the United States.

## V. THE RELIEF GRANTED.

To summarize, it is the holding of this Court that Article 784 of the Texas Penal Code is not overly broad or vague and is therefore constitutional. However, it is our conclusion that Articles 5154d, § 1 and 5154f of Vernon's Texas Civil Statutes and Articles 439, 474 and 482 of the Texas Penal Code are unconstitutional and, therefore, null and void. Plaintiffs are entitled to a declaratory judgment to that effect.

In addition, plaintiffs are also entitled to a permanent injunction restraining the defendants not only from any future acts enforcing the statutes here declared void, but also restraining them from any future interference with the civil rights of plaintiffs and the class they represent. Hairston v. Hutzler, 334 F.Supp. 251 (W.D.Pa.1971).

The Clerk is directed to file and enter this Opinion and provide counsel for all parties with true copies. By a separate simultaneous directive the parties will be instructed as to the preparation and submission of a decree to effectuate the judgment of the Court; that judgment is not to be deemed entered until the signing and entry of the formal decree.